**Ruth Elaine MCCARTHY, Plaintiff,**

v.

**TEXAS INSTRUMENTS, INC., Defendant.**

### No. CIV.A. 97–1215–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 7, 1998.

Bernard E. Goodman, Nancy D. Greene, Gary & Goodman Ltd., Vienna, VA, for Plaintiff.

Willis J. Goldsmith, Thomas M. Beck, Sarah B McClure, Jones, Day, Reavis & Pogue, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This sex discrimination action, brought under both federal and state laws, presents the pressing question whether the Supreme Court of Virginia's recent decision in *Doss v. Jamco, Inc.*, 492 S.E.2d 441 (1997), precludes a plaintiff from pursuing a common law employment discrimination action based on the Commonwealth's public policy against discrimination because of race, color, religion, national origin, sex, pregnancy, age, marital status, or disability.[1] The matter came before the Court on defendant's Motion for Summary Judgment on plaintiff's several state and federal discrimination claims, and on plaintiff's cross-Motion for Partial Summary Judgment on her federal retaliation claim. For the reasons stated from the bench, defendant's motion was granted and plaintiff's federal and state claims were dismissed. This memorandum opinion elaborates the reasons for the dismissal of plaintiff's common law wrongful termination claim.[2] As to that claim, *Doss v. Jamco*

---

1. This question has not been conclusively resolved by either the Fourth Circuit or the Supreme Court of Virginia. Two Virginia Circuit Court cases have considered the issue and come to opposite conclusions. *Compare Rodriguez v. Newport News Shipbuilding & Drydock Co.*, At Law No. 24072 (Seventh Jud. Cir. Feb. 5, 1998) (answering question in the negative) *with Hygh v. Geneva Enters., Inc.*, At Law No. 163326 (Nineteenth Jud. Cir. Dec. 29, 1997) (answering question in the affirmative). The question presented is also currently under advisement in a separate action in this District. *See Williamson v. Virginia First Sav. Bank*, No. 3:98–038 (E.D.Va. Mar.

30, 1998) (hearing on defendants' motion to dismiss). Finally, the Fourth Circuit has addressed the issue without analysis in an unpublished opinion. *See Early v. Aerospace Corp.*, 139 F.3d 888 (4th Cir.1998) (holding that in Virginia common law causes of action for wrongful discharge in violation of public policy have been abrogated).

2. For an explanation of the reasoning underlying the rulings on the federal claims, reference is made to the transcript of the February 13, 1998, hearing on the summary judgment motions.

teaches that such a cause of action is no longer available in Virginia in most circumstances.

## I

Plaintiff Ruth Elaine McCarthy was employed from January 15, 1996, to April 5, 1996, as an Executive Marketing Assistant in the Government Solutions Business Unit of Texas Instruments Software ("TI"). Plaintiff worked directly for Lawrence Singer, whom she now alleges discriminated against her on the basis of her sex. Plaintiff's responsibilities included, *inter alia*, handling Singer's travel arrangements, maintaining his calendar, composing correspondence, assisting with Marketing Division presentations, and answering Singer's phone. Plaintiff's job also required her to report to work by 8:30 every morning.[3]

Plaintiff routinely arrived at work late. In her own deposition, she admits reporting at times after 9:00, after 9:30, after 10:00, and even after 10:30. Indeed, her own handwritten time sheets indicate that she arrived at work at 9:00 or later on twenty-one of the twenty-seven days for which she kept such records, and on nine of these days she came in after 9:30. TI policy allowed an employee to work such an alternate schedule ("flex time") only if that employee first established this schedule with his or her supervisor. Plaintiff never met with Singer to establish a flexible schedule. On February 15, 1996, Singer met with plaintiff to discuss her tardiness and to inform her that her arrival times were unacceptable. Plaintiff agreed to begin work every day thereafter at 8:30. Although plaintiff claims that she reported to work on time after that meeting, even the record evidence she cites for that assertion demonstrates that she was often late to work. Moreover, Singer and plaintiff's co-worker Nicole Nunn testified that plaintiff arrived to work late throughout her tenure at TI.

Plaintiff also represented to Singer in her interview and on her résumé that she was proficient in Microsoft Powerpoint, a software application used to create marketing presentations. Plaintiff has attached to her summary judgment pleadings a certificate

---

Briefly, plaintiff's quid pro quo claim was dismissed because she was not subject to objectively unwelcome sexual harassment, *see Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and because any sexual advances that were made were not tied to a job benefit or detriment, *see Spencer v. General Elec. Co.*, 894 F.2d 651, 658 (4th Cir.1990). Plaintiff's hostile environment claim was dismissed because the allegedly harassing conduct was neither severe nor pervasive, *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and because any harassing conduct by plaintiff's supervisor could not be imputed to the employer defendant, *see Andrade v. Mayfair Mgmt., Inc.*, 88 F.3d 258, 261 (4th Cir.1996). Moreover, even if plaintiff had been able to make out a prima facie case on either of these theories, her federal discrimination claims would have been dismissed because defendant offered legitimate, nondiscriminatory reasons for terminating plaintiff (assuming she was terminated), and these reasons were not pretextual. *See White v. Rice*, 46 F.3d 1130 (4th Cir.1995). Finally, plaintiff's retaliation claim was dismissed both because there was no causal nexus between her protected activity and any adverse employment action taken by defendant, *see Munday v. Waste Management of N. Amer.*, 126 F.3d 239, 242 (4th Cir.1997), *cert. denied* ___ U.S. ___, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998), and because defendant had legitimate, nondiscriminatory reasons for terminating plaintiff (assuming she was terminated) that were not pretextual, *see Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir.1997).

3. Plaintiff's attempt to make a genuine issue of material fact regarding her starting time is unavailing. Eight-thirty is the time indicated on the Request for Personnel form that lists an opening for the position as Singer's assistant, and plaintiff admits that, at least after February 15, she and Singer agreed that she would start at 8:30. (Singer in fact testifies that he asked plaintiff to arrive every morning at 8:00, and that she had originally agreed to that schedule.) Plaintiff counters that she was assured when she was hired that she would be able to work flexible hours; however, even in her deposition plaintiff could not point to any statement of a TI official to this effect, but only to her own statement in her interview that she is a single parent and needed flexible hours. Next, plaintiff asserts that TI has no established starting time for its employees. While this may be true, this does not create a genuine issue because whether or not there is a general policy for all employees, it is undisputed (i) that plaintiff agreed, in a meeting with Singer six weeks into her employment, and possibly in earlier meetings, to report at either 8:00 or 8:30, (ii) that the posting for the job opening stated that the employee would be required to begin at 8:30, and (iii) that when plaintiff was working for TI on a temporary basis before her position became permanent, she was required to begin at 8:30.

from Freddie Mac, her former employer, stating that she completed a course on "Designing Presentations with Powerpoint," and an affidavit from her former boss stating that the quality of her work was always acceptable. During plaintiff's tenure at TI, however, it became apparent to her colleagues and supervisor that she lacked such computer skills—or at least lacked the skills that were required to do the job as it needed to be done.[4] As a result, other members of plaintiff's team had to perform many of the computer tasks for which she was responsible.

Plaintiff's next area of performance deficiency concerns the travel arrangements she made for Singer. For example, for the first trip she scheduled, she neglected to reserve a car or hotel for Singer, so he was stranded in another city at midnight without a hotel room. In addition, on other occasions plaintiff made hotel reservations in the wrong cities and failed to upgrade Singer's airline seats. Singer testified that ninety percent of the travel arrangements plaintiff made required correction; plaintiff responds that she did not know Singer's travel preferences because Singer never explained his expectations, and that she was entitled to rely on his travel agent of five years for ensuring arrangements were made correctly. According to a memo Lynn Gilmore, TI's Human Resources manager, wrote to the file, Singer admitted that he had not sat down with plaintiff during her first weeks to establish what he expected of her in this regard.

Finally, plaintiff often failed to answer Singer's telephone, either because she was not in the office or because she let the call go to voice mail. Singer's clients complained to him about this.

Singer informed plaintiff during her first weeks working for him that he had problems with her tardiness, her inability to make proper travel arrangements, her difficulty drafting letters, and her lack of computer skills. On at least one of these occasions Singer included Lynn Gilmore in the meeting. TI asserts that these performance deficiencies were the sole impetus for plaintiff's termination[5] from its employ; plaintiff counters that her termination was a result of gender discrimination. The following incidents comprise the sexual harassment of which plaintiff complains:

(i) After a meeting with an advertising firm, Singer placed his hand on plaintiff's shoulder and said, "This is my first time with terms of endearment and your role as confidante." He then went on to tell plaintiff that his relationship with an employee of that advertising firm had almost ended his marriage.

(ii) When Singer was having his photograph taken, the photographer asked Singer to look down towards plaintiff or plaintiff's chair in order to remove glare from his glasses. Singer responded, "Well how about if I look at her legs?" When another person suggested he look at her feet, Singer made a comment about foot fetishes.

(iii) Singer responded in a "hostile" and "demeaning" manner to a question plaintiff asked about a slide presentation.

(iv) Singer employed a "shocking" tone when he told plaintiff and a co-worker how to make some slides.

(v) Singer suggested to plaintiff that as part of a presentation they either use the concept of a game show with "the pretty women behind this door" or somehow build on the concept of "Weight Watchers and fat women."

(vi) In reference to certain slides Nicole Nunn had produced on her laptop, Singer said to plaintiff, with his hand on her

---

4. There may be a factual dispute as to whether or not plaintiff was "qualified" or trained to use Powerpoint: her résumé and the Freddie Mac certificate suggest that she was. Nonetheless, TI employees uniformly felt that she could not do the job as well as TI required, no matter what her prior skills were.

5. There is conflicting evidence in the record concerning whether plaintiff was terminated or whether she voluntarily resigned. At the summary judgment stage, of course, the evidence must be viewed in the light most favorable to the nonmovant, in this case, plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the Court assumes, without deciding, that plaintiff was terminated from her position at TI.

shoulder, "See, that's what I need Elaine, I need it done just like that."

(vii) Singer sent plaintiff back to the office from a "kickoff" meeting to complete outstanding expense reports.

(viii) Singer cursed, though there is no testimony that the cursing was anything other than gender neutral.

Plaintiff admits that she never complained of any of this conduct at the time it occurred, and that she never reported any occurrences to any person, either within TI or outside the company, until after she was discharged.[6] She did, however, express discontent with her job. Thus, on February 21, 1996, Gilmore received a call from Chris Doxen at TRAK Associates, the employment firm that had placed plaintiff with TI. Doxen informed Gilmore that plaintiff had contacted TRAK, said that she was not happy at TI, and that she wanted to look for another position. Gilmore thus scheduled a meeting with plaintiff, at which plaintiff communicated the same sentiments to Gilmore that she had expressed to Doxen. Plaintiff specifically told Gilmore that she wanted to look for another position outside of TI, and Gilmore agreed to give her some time to do that. By March 7, plaintiff had yet to begin interviewing for other jobs. On March 8, she did not report to work. Thus on March 11 Singer informed Gilmore that he wanted plaintiff's end date to be March 15; Gilmore communicated this information to plaintiff the next day, March 12.

On March 13, plaintiff placed a phone call to Zoe Chapman, a TI Human Resources Manager in Dallas; plaintiff stated that she wanted to speak with an EEO officer. Plaintiff does not recall the content of this conversation, though her notes indicate that she left a message asking for a contact with whom she could speak about "harassment." Chapman specifically recalls plaintiff stating that she had certain complaints about her posi-tion, namely that she was being assigned work that was not part of her job description and that Singer was always "nagging" her about work issues. Chapman states that plaintiff said nothing about sexual harassment, even when asked what the "nagging" involved. Plaintiff also attempted to contact Dee Hunter, a TI EEO officer in Dallas. Hunter recalls receiving a message from plaintiff—which did not explicitly mention harassment[7]—and trying to call plaintiff back several times; plaintiff did not return Hunter's calls. Hunter then called Gilmore, and the two decided that plaintiff should contact Bill Brown, Diversity Manager for TI. Brown attempted to contact plaintiff once he learned of her calls to Dallas, but plaintiff did not return his calls either.

Because TI did not know the exact nature of plaintiff's complaints, instead of terminating her, it placed her on paid leave beginning March 15. A week later, TI received a letter from plaintiff's counsel stating that plaintiff had contacted him about potential sexual harassment and retaliation claims, though no allegations were being made at that time. Once TI learned of plaintiff's claims, it extended her paid leave. When TI asked plaintiff's counsel on April 3 whether plaintiff planned to make any allegations of sexual harassment, counsel did not respond. Accordingly, TI provided plaintiff with the end date of April 5, 1996, at which time she tendered her voluntary resignation.

## II

Summary judgment, of course, is proper only when the record conclusively shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This standard is satisfied when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that par-

---

**6.** There is one exception to this statement: plaintiff did report the photo incident to Gilmore, the HR manager, but not until two weeks after it happened, and even then plaintiff stated that she did not feel the incident constituted harassment.

**7.** Although TI places much emphasis on the fact that plaintiff never mentioned harassment in her calls to Chapman and Hunter, it seems a reasonable inference, when a Virginia employee calls the Dallas Human Resources department and asks to speak to an EEO officer, that the employee has in mind some sort of discrimination complaint.

ty's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough. For the nonmoving party to avoid summary judgment, the evidence, when viewed in the light most favorable to that party, must be sufficient for a reasonable jury to find in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the instant circumstances, though the parties dispute certain significant facts, there are no genuine issues that affect resolution of the instant motions. That is, even taking the facts in the light most favorable to plaintiff, no reasonable jury could find in her favor, and thus TI's motion for summary judgment must be granted.

### III

Disposition of the instant motion turns on the circumstances in which a plaintiff in Virginia may bring a common law cause of action for wrongful termination. In this regard, Virginia strictly adheres to the employment-at-will doctrine. *See Stonega Coke & Coal Co. v. Louisville & N. R. Co.,* 106 Va. 223, 55 S.E. 551, 552 (1906). However, the Supreme Court of Virginia has recognized a narrow exception to that rule to allow for common law claims for wrongful terminations that violate the Commonwealth's public policy. *See Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797 (1985). Such causes of action have come to be known as *"Bowman claims."*

In *Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328, 331 (1994), the Supreme Court of Virginia held that a *Bowman* claim could be based on the public policy of Virginia as that policy is announced in the Virginia Human Rights Act ("VHRA"), Va.Code §§ 2.1–714 to –725. Specifically, the VHRA states that "[i]t is the policy of the Commonwealth of Virginia ... to safeguard all individuals within the Commonwealth from unlawful discrimination because of race,

color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability ...." Va. Code § 2.1–715. Though recognizing that the VHRA did not itself create any new cause of action, *Lockhart* held that the Act could provide the basis for a *Bowman* claim.

In 1995, in response to *Lockhart,* the General Assembly amended the VHRA. (The amendments, not surprisingly, were popularly dubbed the *"Lockhart* amendments.") These amendments added subsections (B) and (C) to § 2.1–725 to allow for a statutory cause of action for wrongful termination in limited circumstances. Specifically, the VHRA now permits a discharged employee to sue his or her employer if the employer employs between five and fourteen employees and if the termination was based on "race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, or [on] age if the employee is forty years or older." Va.Code § 2.1–725(B). Notably, however, the General Assembly also added the following language to § 2.1–725: "Causes of action based upon the public policies reflected in this chapter shall be exclusively limited to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances." Va.Code § 2.1–725(D).[8]

The Supreme Court of Virginia was asked to explain the effect of the new subsection 725(D) on *Bowman* claims in *Doss v. Jamco, Inc.,* 492 S.E.2d 441 (1997).[9] *Doss* held that the *Lockhart* amendments explicitly forbid reliance on the VHRA in prosecuting a *Bowman* claim. *See* 492 S.E.2d at 446–47. As the Supreme Court of Virginia put it,

in amending the Act by adding subsection D to Va.Code § 2.1–725 in 1995, the General Assembly plainly manifested its intention to alter the common law rule with respect to "[c]auses of action *based upon the public policies reflected in [the Act]."* (Emphasis added [in *Doss* ] ). And, just as plainly, the General Assembly altered the common law rule by providing that such

---

8. Language similar to that contained in the new subsection (D) existed in the VHRA prior to the *Lockhart* amendments as well. *See* Va.Code § 2.1–725 (1987) (amended 1995).

9. *Doss* came to the Supreme Court of Virginia by way of certification from the United States District Court for the Western District of Virginia. *See* Rule 5:42, Rules of S.Ct. Va.

causes of action "shall be *exclusively limited* to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances." (Emphasis added [in *Doss* ] ). 492 S.E.2d at 446. The question *Doss* did not explicitly answer, however, is what sources of law other than the VHRA, if any, a plaintiff can rely on in bringing a common law wrongful termination action in Virginia.[10]

■ Plaintiff here points to several laws that, she asserts, announce Virginia's public policy against gender discrimination and thus provide a basis for her *Bowman* claim.[11] The first source of law on which plaintiff relies is Title VII of the Civil Rights Act of 1964. This effort is facially unavailing, as Title VII, a federal statute, does not provide an expression of Virginia's public policy. A *Bowman* claim must find root in a *state* statute. *See Lawrence Chrysler Plymouth Corp. v. Brooks,* 251 Va. 94, 465 S.E.2d 806, 809 (1996). For this reason, too, plaintiff's reliance on the Fourteenth Amendment to the United States Constitution as a basis for her *Bowman* action is misplaced.

■ Plaintiff next points to the Fairfax County Human Rights Act as a source of Virginia's public policy. Plaintiff's argument, though initially appealing, is ultimately unpersuasive. She contends that because counties in Virginia are subdivisions of the Commonwealth, *see Kirkpatrick v. Board of Supervisors,* 146 Va. 113, 136 S.E. 186, 190 (1926), and because under the Dillon Rule localities can exercise only those powers that are delegated to them by the Commonwealth, *see Tabler v. Board of Supervisors,* 221 Va. 200, 269 S.E.2d 358, 359 (1980), county ordinances are essentially state statutes enacted through a local governing body, and are thus expressions of the Commonwealth's

public policy. *See Glaser v. Titan Corp.,* At Law No. 159607 (Nineteenth Jud. Cir. July 16, 1997) (permitting *Bowman* claim to proceed on basis of a county ordinance). Notwithstanding the superficial logic of this argument, it does not satisfy the unambiguous requirement of *Lawrence Chrysler Plymouth* that a *Bowman* claim be based on a state statute. A county ordinance plainly is not a state statute; it is, instead, an enactment of a local governing body that derives its power from the state. A state statute, by contrast, is enacted by the General Assembly and has statewide effect.

■ Finally, plaintiff seeks to base her *Bowman* claim on the Virginia Constitution, which provides that "the right to be free from any governmental discrimination upon the basis of … sex … shall not be abridged." Va. Const. art. I, § 11. To be sure, the Virginia Constitution is not a statute. But to hold that the requirement of *Lawrence Chrysler Plymouth* precludes plaintiff's reliance on the state constitution as a basis for her wrongful termination claim would be to elevate form over substance. Unlike the case with local ordinances, there can be no doubt that the Virginia Constitution expresses, as *Bowman* and its progeny require, "the public policy … underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Miller v. SEVAMP, Inc.,* 234 Va. 462, 362 S.E.2d 915, 918 (1987).

However, the conclusion that a *Bowman* claim can be grounded on the Virginia Constitution does not end the analysis, for *Doss* prevents plaintiff's reliance on the specific policy against gender discrimination enunciated in the Virginia Constitution and, importantly, also enunciated in the VHRA.[12] The

---

**10.** Indeed, the opinion expressly left this question open: "Therefore, we express no opinion concerning the public policy of Virginia as it might be articulated in sources other than the Virginia Human Rights Act." 492 S.E.2d at 443.

**11.** It is worth noting that plaintiff's original complaint cited the VHRA as a source for Virginia's public policy against gender discrimination. Given the holding in *Doss,* it is understandable that this reference does not appear in the second amended complaint.

**12.** In her summary judgment papers, but not in her second amended complaint, plaintiff also adverts to numerous state statutes embodying the public policy against sex discrimination. She claims these provide an alternative basis for her *Bowman* claim. *See, e.g.,* Va.Code § 2.1–374 (proscribing gender discrimination in government contracting); Va.Code § 36–96.1 (prohibiting gender discrimination in housing). Yet, these statutes, even if they had been pled, would be unavailing to plaintiff for the same reasons

Supreme Court of Virginia's reasoning in *Doss* leads inexorably to the conclusion that a plaintiff who brings a *Bowman* claim cannot rely on non-VHRA sources for the stated public policy of Virginia if that policy is articulated in the VHRA, even though it may be articulated elsewhere as well. This conclusion is supported by the holding in *Doss* that the common law rule was altered by the *Lockhart* amendments to the VHRA to limit the availability of common law claims for wrongful termination. The VHRA, as amended, provides that the sole remedies for claims brought pursuant to the policies reflected in it are those found in federal and state statutes, and not at common law. *See* Va.Code § 2.1–725(D). Thus, even though both the VHRA and the Virginia Constitution express the Commonwealth's policy against gender discrimination, any claim against an employer based on such discrimination must be brought under Title VII, the VHRA, or any other state statute that specifically provides for such a cause of action—but not as a common law wrongful discharge claim.

As *Doss* explained, in amending the VHRA "the General Assembly plainly manifested its intention to alter the common law rule with respect to '[c]auses of action *based upon the public polices reflected in [the Act]*.'" 492 S.E.2d at 446 (quoting VHRA; emphasis in original). Special attention must be paid to the use of the word *reflected* in the amendments to the VHRA. The General Assembly could have said that it was abrogating all common law causes of action that were based on the VHRA; but it did not. Instead, it barred all claims that were based on *policies reflected in* the VHRA. The emphasis is clearly on the policies (which happen to be found in the VHRA) rather than on the statute itself. Tellingly, the General Assembly did not limit only those causes of action that are based on policies reflected *exclusively* in the VHRA. Thus, the passage from *Doss* quoted above must be read as follows: "The General Assembly plainly manifested its intention to alter the common law rule with respect to causes of action based upon various public policies; a list of those policies is contained in the VHRA." Put succinctly, that the Virginia Constitution is, as discussed

the legislature eliminated all *Bowman* actions that are based on any policy that happens to be reflected in the VHRA.

It is easy to understand, if not to agree with, the impetus behind the General Assembly's 1995 amendments to the VHRA. Although the Supreme Court of Virginia stated in *Lockhart* that it was relying on the "narrow exception" to the employment-at-will doctrine created in *Bowman, see Lockhart,* 439 S.E.2d at 330, in fact the holding of *Lockhart* greatly expanded the type of claims that *Bowman* would permit and thereby opened the floodgates for common law employment discrimination actions. Indeed, after *Bowman,* and certainly after *Lockhart,* it has become a common practice in Virginia to plead a common law wrongful termination claim along with federal Title VII claims. The 1995 amendments were enacted in direct response to this trend. The amendments' goal of halting this burgeoning practice is perhaps best evidenced by the statement in the new subsection 725(D) that causes of action for enforcing the policies expressed in the VHRA "shall be *exclusively limited* to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances." Va. Code § 2.1–725(D). If plaintiffs were permitted to base *Bowman* claims on policies found in the VHRA merely because the same policies are also found in other statutes, then the *Lockhart* amendments would have little effect. Plaintiffs would still be able to bring such common law claims in direct contravention of the General Assembly's efforts, in enacting the amendments, to curb common law claims based on those policies.

Further evidence of the General Assembly's intent to have Title VII and other federal, state, and local statutory schemes provide the sole remedies for employment discrimination actions is found in the limited cause of action it did create through the *Lockhart* amendments. The VHRA now permits a discharged employee to sue his or her employer for employment discrimination, under the VHRA, if the employer has more than five but fewer than fifteen employees. *See* Va.Code § 2.1–725(B). Notably, Title VII below.

covers employers who have fifteen or more employees. *See* 42 U.S.C. § 2000e(b). Thus, the addition of subsections (B) and (C) to § 2.1–725 of the VHRA suggests that the Act is meant to supplement, but not duplicate, the remedies and causes of action already available under Title VII. In sum, the effect of *Doss* and the *Lockhart* amendments is to eliminate the availability of common law wrongful termination actions based on any public policy that is contained in the VHRA.

There are three factors that might counsel a contrary conclusion. The first is the suggestion in *Doss* that that decision left open the very question at issue here. The Supreme Court of Virginia stated, "we express no opinion concerning the public policy of Virginia as it might be articulated in sources other than the Virginia Human Rights Act." 492 S.E.2d at 443. This statement, however, is appropriately read to mean simply what it says, and no more: it is an observation that the issue certified by the United States District Court was a narrow one, and thus that the court's consideration of the matter was similarly limited in its scope. The *Doss* opinion does not foreclose application of the *reasoning* contained in it to a broader set of circumstances.

The second factor to be weighed is the decision in *Bradick v. Grumman Data Systems Corp.*, 486 S.E.2d 545 (1997). In *Bradick*, the Supreme Court of Virginia allowed the plaintiff to state a *Bowman* claim based on the public policy against disability discrimination found both in the VHRA and in the Virginians with Disabilities Act ("VDA"). *See* 486 S.E.2d at 547. Although *Bradick* came down before *Doss*, it was decided after the enactment of the *Lockhart* amendments. Thus, one might argue that if those amendments were in fact meant to preclude all *Bowman* actions based on any public policy found in the VHRA, *Bradick* would have come out differently; that is, the Supreme Court of Virginia would have denied the plaintiff the right to rely on either the VHRA *or* the VDA as an expression of the Commonwealth's public policy against disability dis-

crimination. This argument has two shortcomings. First, the question of the effect of the *Lockhart* amendments on *Bowman* claims was not addressed in *Bradick*. Thus, the case is accorded minimal weight in the instant analysis. Second, at least to the extent *Bradick* allowed the plaintiff to rely on the VHRA in asserting a common law cause of action, it has been overruled by *Doss*. Thus, its precedential value is uncertain. In short, though the result in *Bradick* is inconsistent with the conclusion reached here, this conclusion is mandated by a subsequent Supreme Court of Virginia decision, namely *Doss*.

The third, and perhaps strongest, contention in opposition to this conclusion is that the General Assembly amended only the VHRA; it did not enact a statute forbidding common law wrongful termination claims that draw on other public-policy statutes.[13] Thus, one might argue that, absent any such indication by the legislature, *Bowman* claims should be no more limited than *Doss* explicitly requires. This contention might have force as a policy argument. But, in light of the language of the *Lockhart* amendments and the reasoning of *Doss*, as discussed above, it cannot ultimately carry the day.

One final point merits mention. If, as concluded here, *Doss* necessarily means that a plaintiff can no longer bring a *Bowman* claim based on any public policy mentioned in the VHRA—and that includes "race, color, religion, national origin, sex, pregnancy ..., age, marital status, [and] disability"—then the presence of *Bowman* claims in state employment-law practice will be severely curtailed. Future discrimination claims based on the classifications noted above will have to be brought under the provisions set out in the VHRA (which covers only employers with five to fourteen employees), some other state statute (such as the VDA), or federal Title VII. In other words, the effect of the holding here is to cut back sharply, if not emasculate, the right of employees to bring employment discrimination claims under Virginia common law. Nonetheless, this result

13. Arguably, the new subsection 725(D) is such an enactment; however, that subsection does not explicitly state that *Bowman* claims are no longer available in the employment discrimination realm.

is mandated by *Doss.* To the extent it is an undesirable result, that is a matter for the General Assembly to consider as part of any future amendments to the VHRA.

## IV

Plaintiff fails to state a *Bowman* claim because *Doss* forecloses a plaintiff from basing a common law wrongful termination claim on any public policy that is reflected in the VHRA, even if that policy is also reflected in other statutes or in the state constitution. Accordingly, TI's motion for summary judgment must be granted, and Count III must be dismissed.

An appropriate Order has issued.