**Robert ANDERSON, Plaintiff,**

v.

**ITT INDUSTRIES CORPORATION, Defendant.**

**No. Civ. A. 99–818–A.**

United States District Court, E.D. Virginia, Alexandria Division.

April 18, 2000.

Aaron Martin Nisenson, Henrichsen & Siegel, P.L.L.C., Washington, DC, for plaintiff.

Stephen W. Robinson, McGuire, Woods, Battle & Boothe, McLean, VA, for defendant.

**MEMORANDUM OPINION**

ELLIS, District Judge.

In this employment discrimination suit, defendant moves to dismiss plaintiff's claim of wrongful termination in violation of Virginia public policy for failure to state a claim pursuant to Rule 12(b)(6), Fed. R.Civ.P. At issue is whether an at-will employee who is discharged for refusing to falsify resumes to be submitted pursuant to a bid on a government contract may maintain a state claim for wrongful termination under the *Bowman* public policy exception to Virginia's at-will employment doctrine.[1]

---

1. *See Bowman v. State Bank of Keysville,* 229     Va. 534, 331 S.E.2d 797 (1985).

**I.[2]**

Plaintiff is an African–American male and a twenty-six year veteran of the United States Air Force. In the summer of 1995, plaintiff submitted a resume to defendant's Federal Service Corporation in response to an advertisement in the Washington Post. Shortly thereafter he was informed that his resume had been selected to be submitted as part of a bid on a $1.5 million technical support contract for a federal agency.[3] Under the terms of the bid, defendant was required to hire plaintiff if the bid was successful. Plaintiff was told that he could expect a senior logistical management position. In October 1995, defendant received the contract for which it had submitted plaintiff's resume. Plaintiff was given the position of Assistant Project Manager, and in that capacity he worked closely with the Project Manager, Michael W.

In October 1996, plaintiff became Project Manager, and the Logistics Contracting Assistant to Philip F., the government agency's Contracting Officer Representative. Plaintiff's duties in those positions were two-fold: first, he managed all employment aspects of the contract, including recruiting, hiring, salary increases, performance appraisals, awards, health insurance, 401k accounts, and security clearances, and second, as a Logistics Contracting Assistant, he inspected, processed, shipped, delivered, and retrieved government communication equipment to and from various vendors in the District of Columbia metropolitan area. Plaintiff claims that under Michael W, who is white, the government agency granted the Project Manager full discretion in hiring employees to perform work under the contract. According to plaintiff, once he became Project Manager, however, the agency insisted on assuming a more active role in the hiring process, even though this, he contends, was a violation of the terms of the contract. Plaintiff further claims that the agency's more active role in the hiring process during the time he was Project Manager manifested itself in unlawful discrimination as the agency staff rejected qualified minority applicants whom plaintiff sought to hire, approving instead less qualified white applicants. In addition, plaintiff claims that the agency staff created a hostile environment for African–American contract employees by refusing to train such employees, complaining about their performance and making derogatory comments about them.

In May 1997, defendant's government contracting supervisor, Lisa G., asked plaintiff why there were still a number of vacant positions on the contract. Plaintiff replied that the agency staff had vetoed several of his selections and had told him to leave two positions open for restructuring purposes. Lisa G. told plaintiff to hire whomever he deemed most qualified and she accordingly moved to limit the agency's role in the hiring process. Plaintiff alleges that he then completed the hiring process, saving defendant and the government agency over $100,000 by hiring employees who already possessed the requisite security clearances. Following this, according to plaintiff, agency staff mem-

---

**2.** The facts recounted here are derived from the complaint's allegations, and are assumed to be true solely for the purpose of disposing of the threshold dismissal motion at bar. *See Martin Marietta Corp. v. International Telecom. Satellite Org.,* 991 F.2d 94, 97 (4th Cir. 1992).

**3.** After this action was filed, the government moved to place the entire case file under seal owing to the presence of classified and sensitive information in the complaint. The motion was granted and the case placed under seal. *See Anderson v. ITT Industries Corp.,*

Civ. A. No. 99–818–A, Order dated July 13, 1999. Thereafter, by Agreed Order, the seal was lifted, except that the underlying, government contract was to be referred to only as a contract between defendant and "an agency or department of the United States," and the facility at which the events in the complaint allegedly occurred would not be identified or affiliated with any specific department or agency of the United States. Also, the Agreed Order stipulated that all employees of defendant company and the government agency would be referred to only by his or her first name and last initial.

bers, unhappy at the number of African–American employees hired by plaintiff, began retaliating against him by complaining about his performance to his corporate supervisors.

Plaintiff claims that the retaliation against him continued throughout 1997. His supervisor, Philip F., however, did not credit the complaints of the agency staff and supported plaintiff's exercise of managerial discretion. In January 1998, plaintiff received his annual performance review. While the review commended plaintiff's "solid performance" as Project Manager, it failed to take note of all his achievements, which included maintaining 100% staffing and winning additional government contracts for defendant. The review, however, did compliment plaintiff on his "good management skills" and stated that customer, i.e., agency, satisfaction was "very high." In recognition of his performance, plaintiff received a bonus of approximately $4100.

In March 1998, plaintiff's supervisor was replaced. His new supervisor, Darlene B., did not resist the agency's attempts to undermine plaintiff's authority, and began reporting the complaints about plaintiff to her superiors. Furthermore, plaintiff claims that, in May 1998, as defendant was preparing for a contract rebid, Michael W. instructed him to "improve" several resumes that defendant would be submitting in support of its bid by adding false qualifications to the resumes that the employees did not possess. Plaintiff refused, on the ground that falsifying resumes to be submitted as part of a bid on a government contract was against the law. The following month, plaintiff filed a complaint with defendant's Human Resources department, requesting an investigation into the derogatory comments and other reprisals directed against him, including his 1997 performance appraisal. He claims no action was ever taken on this complaint.

On July 24, 1998, plaintiff met with one of his supervisors, Jerry B. and a member of defendant's Human Resources Department, Jeannie C., and informed them of the numerous problems he was experiencing on the contract, such as the harassment of and discrimination against African–American employees. A few days later, on July 28, 1998, plaintiff claims that he saw one of the agency staff members who had been retaliating against him, Robert K., storm out of his office saying, "I got that black bastard out of here," and then, "that black bastard is out of here." A few minutes later, plaintiff was paged by Jeannie C. When he arrived at her office, she told him that he was being placed on immediate administrative leave. He was given no reason for this decision. On August 7, 1998, Jeannie C. called plaintiff into the office and gave him a letter terminating his employment, effective immediately. According to plaintiff, the only reason given for his termination was agency dissatisfaction with his performance.

Thereafter, plaintiff filed a timely EEOC complaint alleging discrimination and retaliation on the basis of race. He received a right-to-sue letter on March 12, 1999. Then, proceeding *pro se*, plaintiff filed the instant action on June 9, 1999. In his Amended Complaint, filed on June 15, 1999 plaintiff stated claims for (i) discrimination on the basis of race and in retaliation for engaging in protected activity in violation of Title VII.[4] (ii) denial of equal treatment in the making and enforcing of a contract on the basis of race in violation of 42 U.S.C. § 1981, (iii) violation of equal protection under the Due Process Clause of the Fifth Amendment, and (iv) wrongful discharge in violation of Virginia's public policy exception to the doctrine of at-will employment. In December 1999, defendant's motion to dismiss Counts III and IV for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P. was granted. As to Count IV, plaintiff had failed to state a claim for wrongful discharge under Virginia law because he had failed to identify a *Virginia* public policy that was allegedly

---

**4.** *See* 42 U.S.C. § 2000e *et seq.*

violated by his discharge. *See Anderson v. ITT Industries Corp.*, Civ. A. No. 99–818–A, Order dated December 10, 1999. Instead he alleged only violation of a federal law, namely the False Claims Act,[5] which is insufficient to state a claim for wrongful discharge under Virginia law.[6] The Order also granted plaintiff leave to seek a reconsideration of any of the rulings, should there be good cause to do so.

Plaintiff retained counsel on December 21, 1999, and counsel entered an appearance on January 7, 2000. Because the case was then under seal, plaintiff's counsel was required to obtain a security clearance. After plaintiff's counsel received the requisite security clearance, plaintiff moved for reconsideration of the December 10, 1999 order dismissing Count IV of the complaint. By order dated February 18, 2000, the motion for reconsideration was denied, but plaintiff was granted leave to file an amended complaint to include a claim for wrongful discharge in violation of a Virginia public policy. *See Anderson v. ITT Industries Corp.*, Civ. A. No. 99–818–A, Order dated February 18, 2000.

Plaintiff filed an amended complaint on March 24, 2000. In his Second Amended complaint, plaintiff again states four claims: (i) discrimination on the basis of race and retaliation in violation of Title VII, (ii) violation of 42 U.S.C. § 1981, (iii) denial of equal protection under the Due Process Clause of the Fifth Amendment and (iv) wrongful discharge. In Count IV, plaintiff asserts that he was discharged for refusing to falsify resumes to be submitted as part of a rebid on a government contract, which would have been a violation of two Virginia criminal statutes, and thus his termination was against Virginia public policy. Defendant now moves to dismiss

Count IV for failure to state a claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P. The narrow issue presented here is whether plaintiff's termination for refusing to engage in conduct he claims would have violated the Virginia statutes against forgery, Va.Code § 18.2–172, and obtaining money by false pretenses, Va.Code § 18.2–178, falls within Virginia's public policy exception to the at-will employment doctrine.

## II.

The standard applicable to a threshold dismissal motion is too well-settled to be disputed. In essence, on a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff, all facts asserted therein must be taken as true, and dismissal is warranted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Higgins v. Medical College*, 849 F.Supp. 1113, 1117 (E.D.Va.1994).

Plaintiff asserts that he was terminated for refusing to engage in conduct that would have been illegal under Virginia law, namely forgery and obtaining money under false pretenses, and as a result, his termination was against the public policy of Virginia as articulated by those statutes.[7] Defendant argues, to the contrary, that plaintiff cannot state a claim for wrongful discharge under the public policy exception because plaintiff, an at-will employee, is not within the group of individuals protected by the statutes on which he relies. In essence, plaintiff claims that his wrongful termination claim survives threshold attack because it fits within Vir-

---

5. *See* 31 U.S.C. § 3729.

6. *See McCarthy v. Texas Instruments*, 999 F.Supp. 823, 829 (E.D.Va.1998).

7. The forgery statute, Va.Code § 18.2–172, states in pertinent part:

    If any person forge any writing ... to the prejudice of another's right, or utter, or attempt to employ as true, such forged writ-

ing, knowing it to be forged, he shall be guilty of a Class 5 felony.

Virginia Code § 18.2–178, Obtaining money or signature, etc., by false pretense, states in pertinent part:

    If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof. ...

ginia's public policy exception to the at-will employment doctrine. Thus, a brief history of this exception provides useful context for the resolution of the dispute at bar.

To begin with, it is neither disputed nor disputable that Virginia continues to adhere to the doctrine of employment at will. *See, e.g., Lawrence Chrysler Plymouth Corp. v. Brooks,* 251 Va. 94, 465 S.E.2d 806, 808 (1996); *McCarthy,* 999 F.Supp. at 828. But this adherence is not absolute; there is a judicially created exception. In 1985, the Supreme Court of Virginia created an ostensibly narrow exception to the doctrine for common law claims for wrongful termination where the termination violates a public policy of the Commonwealth. *See Bowman,* 331 S.E.2d at 801. Understandably, such causes of action have come to be known as *"Bowman* claims." *See id.; McCarthy,* 999 F.Supp. at 828. Specifically, in *Bowman,* the Supreme Court of Virginia held that the plaintiffs' employer was liable for wrongful discharge after it had terminated plaintiffs, who were stockholders in the bank corporation that employed them, for refusing to vote their stock in accordance with the demands of management. The court reasoned that the employees' termination violated the public policy, expressed in Virginia securities law,[8] in favor of individual stockholders' right to vote their shares free from duress and intimidation by corporate management. *See Bowman,* 331 S.E.2d at 801. Given this, the court concluded, the employer could not "lawfully use the threat of discharge ... as a device to control the otherwise unfettered discretion of a shareholder to vote freely his or her stock in the corporation." *Id.*

Since the *Bowman* decision in 1985, the public policy exception has evolved significantly, both in the courts and in the legislature, but it has remained a relatively narrow exception, and attempts to expand the doctrine have met with resistance in the legislature. In *Lockhart v. Commonwealth Educ. Sys. Corp.,*[9] the Supreme Court of Virginia held that a *Bowman* claim could be based on Virginia public policy embodied in the Virginia Human Rights Act ("VHRA"), Va.Code § 2.1–714 *et seq.* This interpretation would have significantly broadened the scope of the public policy exception, but the General Assembly of Virginia, in response to *Lockhart,* amended the VHRA to state that "[c]auses of action based on the public policies reflected in this chapter shall be exclusively limited to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances." Va.Code § 2.1–725(D). In a subsequent case, *Doss v. Jamco, Inc.,*[10] the Supreme Court of Virginia interpreted this amendment as explicitly forbidding reliance on the VHRA in prosecuting a *Bowman* claim, thereby acknowledging the General Assembly's expressed intent to limit the scope of *Bowman.*

While Doss makes clear that a *Bowman* claim cannot be based on a public policy enunciated in the VHRA, debate continues over which statutes may serve as the basis of a *Bowman* claim. Sensitive to this, the Supreme Court of Virginia, in two recent decisions, has sought to settle this debate. For example, it is now clear, as was widely supposed, that while all Virginia statutes, reflect a Virginia public policy to some degree, "termination of an employee in violation of the policy underlying any one of them does not automatically give rise to a ... cause of action for wrongful discharge." *City of Virginia Beach v. Harris,* 259 Va. 220, 523 S.E.2d 239, 245 (2000). Instead, statutes embodying a public policy sufficient to form the basis of a wrongful discharge claim fall into two categories. *See id.* The first is a statute stating explicitly that it expresses a

---

**8.** *See* Va.Code § 13.1–662, formerly § 13.1–32.

**9.** 247 Va. 98, 439 S.E.2d 328, 331 (1994).

**10.** *See* 254 Va. 362, 492 S.E.2d 441, 446–47 (1997); *see also McCarthy,* 999 F.Supp. at 831–32 (noting that the result in *Doss* "severely curtailed" the scope of *Bowman* claims).

public policy of the Commonwealth. *See Lockhart*, 439 S.E.2d at 331. The second, far more common category consists of statutes that do not explicitly state a public policy, but rather "are designed to protect the property rights, personal freedoms, health, safety or welfare of the people in general," and thereby further an underlying, established public policy that is violated by the discharge at issue. *Harris*, 523 S.E.2d at 245 (internal quotation marks omitted); *Bowman*, 331 S.E.2d at 801. Yet, even if a statute falls within one of these categories, it may not serve as the basis of a *Bowman* claim, unless the aggrieved employee also shows that he or she is a member of the class of individuals the public policy is intended to benefit. *See Mitchem v. Counts*, 259 Va. 179, 523 S.E.2d 246, 251 (2000); *Dray v. New Market Poultry Products, Inc.*, 258 Va. 187, 518 S.E.2d 312, 313 (1999). In other words, to state a *Bowman* claim, the discharged employee must show that he or she "fell within the protective reach of the statute which supplied the public policy component of his or her claim." *Leverton v. AlliedSignal, Inc.*, 991 F.Supp. 486, 493 (E.D.Va.1998).

In the instant case, neither of the statutes on which plaintiff relies fall into the first category of statutes eligible to serve as the basis of a *Bowman* claim, as neither explicitly says that it expresses a public policy of the Commonwealth. But, both statutes do fall squarely within the second category of such statutes, since both are clearly designed to protect the welfare and property rights of the general public by prohibiting the use of forged documents to prejudice the rights of others,[11] or to obtain property under false pretenses.[12] It is therefore clear that the statutes on which plaintiff relies may serve as the basis of a *Bowman* claim. *See Harris*, 523 S.E.2d at 245.

The next question, then, is whether plaintiff falls within the class of individuals the forgery and false pretenses statutes are designed to benefit or protect. *See Mitchem*, 523 S.E.2d at 251; *Harris*, 523 S.E.2d at 245. Defendant's view is that plaintiff is not within the protective reach of the forgery and false pretenses statutes because those statutes were designed to protect the victims of fraud, and plaintiff would not have been a victim of any forgery he was asked to perform. Although true, this point is not dispositive as a statute's protective reach may extend beyond the class of persons who are victims of its violation. Indeed, a statute's protective reach may extend to those who have a legal duty under that statute. *Dray v. New Market Poultry Products, Inc.*, 258 Va. 187, 518 S.E.2d 312, illustrates this point. There, the plaintiff, a quality control inspector at a poultry processing plant who was terminated for reporting unsanitary conditions to a government inspector, failed to state a claim for wrongful discharge because the statute upon which she relied, namely the Virginia Meat and Poultry Products Inspection Act,[13] did not "confer any rights *or duties* upon her or any other similarly situated employee of the defendant." *Dray*, 518 S.E.2d at 314 (emphasis added).[14] The result in *Dray* was different from the result in *Bowman* because the statute in *Dray* did not confer a right or impose a duty on plaintiff to report violations, in contrast to the statute in *Bowman*, which did confer a right upon plaintiffs to vote their shares free from intimidation. *See id.* In other words, the plaintiff in *Dray* could not assert a *Bowman* claim because she had neither a right nor a duty to do what she did under the statute on which she relied. *See id.*

In its two most recent decisions involving *Bowman* claims, the Supreme Court of

---

**11.** *See* Va.Code § 18.2–172.

**12.** *See* Va.Code § 18.2–178.

**13.** *See* Va.Code § 3.1–884.17 *et seq.*

**14.** More broadly, *Dray* stands for the proposition that the public policy exception does not encompass a generalized, "whistleblower" retaliatory discharge claim, thereby evincing the Supreme Court of Virginia's intent to limit the expansion of the *Bowman* exception.

Virginia has further refined the requirement that a plaintiff asserting a *Bowman* claim be within the class of persons the statute relied upon was intended to reach. Both were issued on the same day, and both involved, as here, attempts by a plaintiff to use a criminal statute as the basis of a *Bowman* claim. *See Harris,* 523 S.E.2d at 246; *Mitchem,* 523 S.E.2d at 252.[15] In one instance the attempt failed, and in the second, it succeeded. Read closely, these decisions, in the context of sharply contrasting facts, point persuasively to the proper result here.

In *Harris,* the plaintiff was a police officer who was discharged for obtaining a criminal warrant charging a superior officer with obstruction of justice after the superior officer had directed the plaintiff not to serve a warrant on a criminal suspect. *See Harris,* 523 S.E.2d at 241. Plaintiff claimed he had been discharged in violation of the public policy expressed in the obstruction of justice statute. *See* Va. Code § 18.2–460. Specifically, he claims he was fired for taking steps to thwart his superior's attempt to obstruct justice. The Supreme Court of Virginia rejected this claim on the ground that the obstruction of justice statute was designed to protect the public, and plaintiff was attempting to use the statute as a shield to protect himself as a police officer from the consequences of his decision to charge his superior officer. *See id.* at 246.

Different facts led to a different result in *Mitchem.* There, the Supreme Court of Virginia upheld the *Bowman* claim of an employee who had been terminated for refusing to submit to her supervisor's sexual advances on the ground that her termination violated the public policies expressed in the criminal statutes proscribing fornication,[16] and lewd and lascivious behavior.[17] *See Mitchem,* 523 S.E.2d at 252. The plaintiff in *Mitchem* was within the class of persons those statutes were designed to reach or benefit because they were criminal statutes "enacted for the protection of the general public," of which that plaintiff was a member. *Id.* at 251. Although the *Mitchem* opinion includes the ritual incantation to the effect that the *Bowman* public policy exception is narrowly construed, it also contains broad dictum, applicable here, to the effect that the employment-at-will doctrine was not intended to "serve as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." *Id.* at 252.

*Mitchem* and *Harris* apply the same principle to contrasting facts to reach different, but consistent results, and in so doing shed light on the scope and application of the requirement that plaintiff fall within the class of persons the statutes relied upon are designed to protect or benefit. The plaintiff in *Harris* was not within the protective reach of the obstruction of justice statute because he was neither required by the statute to do what he did, nor was he a victim of any putative violation of it. Instead, he sought to invoke the obstruction of justice statute to justify an act the statute did not require, namely, obtaining an arrest warrant for his superior officer. By contrast, the *Mitchem* plaintiff was within the protective reach of both statutes cited there because she was arguably under a legal duty, imposed upon her by the statutes, to refrain from doing what her supervisor wanted her to do, namely, engage in fornication and lewd and lascivious conduct. In sum, these cases taken together teach that, to assert a valid *Bowman* claim, a plaintiff must have either (i) a statutorily-created right which the termination interferes with or violates, (*Bowman*) or (ii) a statutorily-imposed duty which the employee is terminated for refusing to violate (*Dray* and *Mitchem*).

---

**15.** In fact, *Harris* and *Mitchem* were the first Virginia Supreme Court cases in which plaintiffs sought to use a criminal statute as the basis for a *Bowman* claim.

**16.** *See* Va.Code § 18.2–344.

**17.** *See* Va.Code § 18.2–345.

From this, it follows that this case is governed by *Mitchem*. Like the plaintiff in *Mitchem*, plaintiff here was discharged for allegedly refusing to engage in conduct prohibited by a Virginia criminal statute. And, like the plaintiff in *Mitchem*, plaintiff here falls within the class of individuals the statutes relied on were designed to protect, because the statutes imposed upon plaintiff a legal duty not to engage in the prohibited conduct. *Mitchem* and *Dray* make clear that an employee does not have to be the victim of the crime he or she is asked to commit to fall within the statute's protective reach. Rather, it is sufficient that the statute imposes upon the employee a duty not to engage in the conduct ordered by the employer. The statutes plaintiff cites plainly imposed a duty on him not to commit the crimes of forgery or obtaining money under false pretenses. As a result, plaintiff is within those statutes' protective reach and he states a valid *Bowman* wrongful discharge claim where, as here, he alleges that his employer fired him for refusing to engage in statutorily prohibited conduct.

To be sure, the result reached here, as defendant argues, may be viewed as significantly broadening the scope of the *Bowman* exception, which the Supreme Court of Virginia has consistently described as narrow. *See Mitchem*, 523 S.E.2d at 252. *Mitchem*, however, specifically rejected this argument, noting that recognition of a *Bowman* claim in these circumstances is not "an incursion into the employment-at-will doctrine." *Id.* And, in any event, however narrow the exception, it is not so narrow as to permit the employment-at-will doctrine to serve as a shield to protect "employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." *Id.*

For the reasons set forth here, the complaint states a valid claim *Bowman* claim for wrongful discharge in violation of Virginia public policy and accordingly the motion to dismiss Count IV must be denied.[18]

---

18. Left for future resolution are various questions that will arise from the necessity of trying a criminal case within the civil wrongful discharge case. Presumably, plaintiff will have to prove that the conduct he refused to engage in was a crime, i.e., that all of the elements of statute were met and that his or her refusal to engage in the conduct was the cause of his discharge. In some cases, this will be straightforward, whereas in other cases, such as those involving crimes of business or tax fraud, determining whether the requested conduct was illegal might well prove to be a complex task. And, where, as here, the conduct the employee refused to engage in involves criminal fraud, it is unclear whether the judge or the jury determines the question of the materiality of the alleged fraud.