Stephen A. **STOREY**, Plaintiff,

v.

**PATIENT FIRST CORPORATION, et al.,** Defendants.

**No. Civ.A. 3:01CV870.**

United States District Court, E.D. Virginia, Richmond Division.

June 14, 2002.

Robert C. Rice, Carrell & Rice, Jack W. Burtch, Jr., Virginia Law & Government Affairs, PC, Richmond, VA, for Plaintiff.

D. Eugene Webb, Kimberly W. Daniel, Troutman Sanders, LLP, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case is before the Court on the defendants' Motion to Dismiss several counts of the plaintiff's First Amended Complaint pursuant to Fed.R.Civ.P.

12(b)(6). For the reasons set forth below, the motion is granted in part and denied in part.

## STATEMENT OF FACTS

The following are the facts as alleged in the plaintiff's First Amended Complaint (the "Complaint"). As required when considering a motion pursuant to Rule 12(b)(6), the facts, as alleged in the Complaint, are presumed to be true.

### A. Background

#### 1. The Parties

The plaintiff, Stephen A. Storey, a resident of Virginia, is a shareholder, and formerly was the Chief Financial Officer ("CFO") and the Executive Vice President of Finance and Corporate Development, of defendant, Patient First Corporation ("Patient First"), a Virginia corporation with its principal place of business in Virginia.[1] At all times relevant to the allegations in the Complaint, defendant, R.P. Sowers III, M.D., was the Chief Executive Officer, and the Chairman of the Board of Directors (the "Board"), of Patient First, and defendant, George H. Morrison, was the Chief Operating Officer, and a member of the Board, of Patient First. (Complaint, ¶¶ 1–5).

Patient First is in the business of providing health care services through its operation of ambulatory care facilities in Virginia and Maryland. Before becoming a shareholder in Patient First, Storey assisted Sowers in preparing a business plan for the purpose of attracting capital investment with which the company would establish a nationwide chain of ambulatory care centers. On or about January 21, 1986, Storey and other investors became share-

1. Before June 17, 1988, Patient First was known as CEC Management, Inc.

holders of Patient First,[2] and Storey entered into an agreement pursuant to which he agreed to serve as the company's CFO. In that role, Storey worked with other individuals who held substantial equity interests in Patient First in an effort to develop business for, and to attract further capital investment in, the company. (Complaint, ¶¶ 6–8).

## 2. The Contract And Stock Agreements

By letter agreement dated January 1, 1991, Storey and Patient First entered into a new contract (the "Contract") that governed the terms of Storey's employment, compensation, and stock ownership interests in the company, and that superceded the previous agreement between the parties. (Complaint, ¶ 10). The following provisions of the Contact[3] are particularly relevant to Storey's claims:

1. *Employment*

(A) The Company [Patient First] hereby employs you and you hereby accept such employment upon the terms and conditions set forth herein. This agreement shall be effective January 1, 1990[sic], and shall continue until terminated as provided in Paragraph 7 (the "Term of Employment"). During the Term of Employment, you shall devote your full time, attention and efforts to the business of the Company, except as expressly agreed otherwise in writing by the Company, and use your best efforts to promote the interests of the Company.

7. *Termination*

The Term of Employment shall be for one (1) year from the date of this Agreement and from year to year thereafter, unless sooner terminated (i) by the Company, with or without cause, upon 180 days notice to you, (ii) by you upon 120 days notice to the Company, or (iii) by your death. Termination by the Company shall be effective only if approved by a vote of 80% of the persons who are then serving as Directors of the Company. . . .

The Contract also provides that Storey was to receive compensation in the amount of $123,000 per year, and that he would "be entitled to participate in any vacation, bonus, stock option, incentive compensation, deferred compensation [etc.] . . . or other plan or program and to receive any other benefits for which [he was] eligible and which the Company at its sole option provide[d] for [him] or for its employees generally." (Complaint, ¶ 13; defendants' March 8, 2002 Memorandum in Support of Motion to Dismiss, Ex. A.).

Storey also alleges that, on April 5, 1995, he entered into two additional contracts with Patient First, an Incentive Stock Option Agreement and a Rights Agreement (collectively, the "Stock Agreements"),[4] pursuant to which he acquired the option to purchase 4,000 shares of the stock of

2. At the time of his initial employment with Patient First, Storey purchased 9,200 shares of the stock of the company at a price of $.05 per share (the stock's par value).

3. Although Storey referred to these provisions in the Complaint, he did not include the full text thereof in that pleading. The defendants appended a copy of the Contract to their Memorandum in Support of their Motion to Dismiss (as Exhibit A), however, and Storey has not disputed the authenticity of that reproduction. Accordingly, that document properly may be considered in deciding the motion pursuant to Fed.R.Civ.P. 12. *See e.g., Beddall v. State Street Bank & Trust, Co.,* 137 F.3d 12, 17 (1st Cir.1998) (citing authorities).

4. Neither party has provided the Court with copies of the Stock Agreements.

Patient First at a price of $44.00, as well as other rights incident thereto. The Stock Agreements allegedly provide that Storey was entitled to a payment from Patient First (in the form of either cash or stock) of the net value of the 4,000 shares of Patient First stock (based on its fair market value) less the option price of $44.00 per share. In addition, Storey allegedly was entitled under the Stock Agreements to exercise the options granted therein within three months after the termination of his employment with Patient First.[5] (Complaint, ¶¶ 57–60).

### 3. The History Of Storey's Employment

Storey alleges that he "worked reliably and diligently on behalf of [Patient First], regularly devoting 50–60 hours ... per week to [that] company's business, working early and late hours, Saturdays and Sundays and on his vacations." On account of such efforts, Storey's compensation increased over the years so that, in 1997, he was earning $350,000 per year.[6] He was one of three members of the Executive Committee of Patient First, he participated in all meetings of the Board, and, in July 1997, he was promoted to the position of Executive Vice President of Finance and Corporate Development. (Complaint, ¶¶ 14–16).

Storey avers that, in or about October 1996, he obtained and provided to Sowers a copy of certain investment related material respecting a venture that the parties

have referred to as "Alfine". He also states that "Sowers delivered the Alfine Investment Material to Dr. Tom Dwyer, Patient First's technology adviser, for his review and comment[,]" and that, thereafter, "Sowers returned [that material] to Storey[,] advising him (based on Dwyer's review) that an investment in Alfine would be 'throwing money away.'" Notwithstanding Sowers' pessimism respecting that venture, Storey and "others at Patient First" invested their personal funds in Alfine. (Complaint, ¶¶ 17–20).

Storey also alleges that, "[d]uring the course of his [employment with] Patient First, Storey expressed concerns [that] he had about the company or its operations, but ultimately acquiesced in the decisions made by Sowers as [CEO] and Chairman." In particular, Storey avers that, in early 1997, he reported to both Sowers and Morrison specific concerns involving "potential improper billings in the approximate amount of $500,000 [by Patient First] to the federal government for medical services provided to CHAMPUS beneficiaries by 'moonlighting' active-duty military doctors."[7] These concerns had been related to Storey by "other members of management, medical professionals[,] and his subordinates[.]" According to Storey, "Sowers and Morrison initially failed to take any corrective action," which "expos[ed] [Patient First] to substantial liability." (Complaint, ¶¶ 21–23).

Storey "persisted in raising the issue [of the improper billings] until Sowers and

---

5. In his March 25, 2002 brief in opposition to the defendants' motion to dismiss, Storey emphasizes that, at the heart of the Contract and the Stock Agreements lay a "purpose ... to protect [his equity] interest [in Patient First through his] participation in the development of th[at] company's business." Storey states that this purpose is "fundamental to the nature" of his claims, and statements respecting that alleged purpose are interspersed

throughout Storey's Complaint. *See* Complaint, ¶¶ 55, 68, 73, 78, 83, 91, 97.

6. Storey alleges that, "[d]uring the entire course of his twelve years with Patient First, [he] was its highest paid employee."

7. The parties have not provided additional factual detail respecting the nature of these alleged "improper billings".

Morrison ultimately agreed to implement ineffective changes that reduced, but did not eliminate, the incidence of violations." According to Storey, Sowers and Morrison refused to repay the federal government certain amounts that already had been billed improperly, and they continued to "alter electronic medical records submitted to CHAMPUS for reimbursement." Despite Storey's repeated entreaties to Sowers and Morrison respecting the adequacy of Patient First's "computer automated method of coding for Medicare patients" (a system that Sowers designed, and the use of which Storey believed was causing Patient First to over-bill the federal government), Sowers took no ameliorative measures and, instead, insisted that any systemic errors could be overridden and corrected manually by medical professionals. (Complaint, ¶¶ 24–25).

Concerned that he might face personal liability for what he believed were substantial fraudulent claims submitted to the federal government, Storey endeavored "to take whatever action was necessary" to report the suspected violations. He began his own investigation into Patient First's billing practices and researched the potential liability that the company (and its agents) might face if civil or criminal action were instituted against it. (Complaint, ¶¶ 26–28).

In addition, Storey alleges that he was concerned about, and outspoken with respect to, other potential legal violations for which Patient First and its agents might be liable. These potential violations involved disparate matters including the accuracy of certain information represented in Patient First's financial records, and its compliance with federal employment discrimination laws and applicable prescription drug repackaging regulations. (Complaint, ¶¶ 30–32).

Again, however, Storey's "pleas to Sowers and Morrison[,]" are said to have gone unheeded, and the defendants allegedly failed to take remedial measures respecting Storey's legal concerns. Therefore, in or about September 1997, and through communications with Alfred R. Berkeley, III (who was one of Patient First's outside directors), Storey decided to advise the Board about all of the foregoing legal issues. Storey sought to "correct the violations and [to] protect the company from continuing liabilities." Storey alleges, upon information and belief, that Berkeley in fact communicated to, and discussed with, Patient First's legal counsel all of Storey's concerns. (Complaint, ¶¶ 33–34).

Thereafter, the Board retained the law firm of Wilcox & Savage "to conduct an audit of Patient First's operations and business practices ... to determine its compliance with state and federal laws...." That audit occurred over a two-day period in October 1997 and part of the audit involved "extensive interviews with Patient First employees." As he had been instructed to do (in a letter written by Sowers to Storey and other Patient First employees), Storey met with attorneys from Wilcox & Savage and cooperated fully, which included both his disclosure of the legal violations about which he had been concerned and his urging those attorneys to take all necessary corrective actions with respect thereto. (Complaint, ¶¶ 35–37).

### 4. Storey's Termination

Storey claims that, "[b]efore Wilcox & Savage was able to present its findings in writing to the Board [,]" Sowers convened a meeting that four of the six members of the Board attended. At that meeting, the Board voted to terminate both Wilcox and Savage's representation of Patient First and Storey's employment with Patient

First. Shortly thereafter, Patient First terminated KPMG as its auditor. (Complaint, ¶ 38).

Storey alleges that, after he reported his aforementioned legal concerns, "Sowers, with knowledge of these concerns and in collusion with Morrison, embarked on a scheme to terminate Storey's employment with Patient First [which they] intended to further their own personal interests, rather than any legitimate interest of the company. . . ." As part of this alleged scheme, "Sowers fabricated charges that Storey breached his obligations to Patient First by keeping the Alfine investment opportunity for himself rather than making it available to Patient First." In addition, Storey alleges, upon information and belief, that "Sowers directed an employee of Patient First surreptitiously to obtain after business hours a copy of Storey's private computer files including the information relating to his investment in Alfine." Sowers communicated to Patient First's legal counsel his false accusation that Storey improperly had usurped a business opportunity that Patient First would have been interested in exploring and developing. Based on this false accusation, Sowers was able to obtain a legal opinion which expressed the view that Storey had breached fiduciary duties that he owed to Patient First.[8] (Complaint, ¶¶ 39–43).

Storey also alleges, upon information and belief, that Sowers arranged a special meeting of the Board, eighty percent approval of the members of which would be required in order to terminate Storey's employment, to take place on November 10, 1997. Storey claims that Sowers "directed a Patient First employee to provide telephonic and written notice of the special meeting to selected directors, but only

written notice (or possibly no notice at all) to other directors." More specifically, Storey avers that, although three days notice was required to conduct a special meeting of the Board, notice was not delivered to Berkeley's office until the afternoon of Friday, November 7, 1997, and that delivery of that late notice was intentional. In fact, Berkeley did not become aware of the special meeting until November 11, 1997, the day after that meeting had occurred. It was at the November 10 special meeting that the Board voted to terminate Storey's employment. (Complaint, ¶¶ 45–48).

As of November 1997, the Board of Directors of Patient First consisted of six members. As Storey alleges, "[t]he affirmative vote of five such members therefore was necessary to obtain the 80 percent vote required to terminate Storey's employment." (Complaint, ¶ 46). Nevertheless, on November 10, 1997, only four of the six members of the Board voted in favor of Sowers' proposal to terminate Storey's employment. The resolution by which Storey's termination was accomplished provided that, "in lieu of 180 days [pre-termination] notice," which was required under the Contract, Storey would receive compensation for the same period of time. Also, on November 10, 1997, Patient First informed Storey that he had been terminated, demanded that he leave the premises of Patient First, and seized his personal files. Storey alleges that the Board voted to terminate him "because Sowers and Morrison knew or believed he was forcing resolution of questionable business practices and taking steps leading to legal actions against Patient First to expose the false claims [and other alleged legal violations]" and that, as a result of his termination, he "was denied the bene-

---

8. Storey also alleges, upon information and belief, that "Sowers did not pursue a similar legal opinion[,] or pursue any other action[,] with respect to the other Patient First employees, officers or directors who also invested in Alfine." (Complaint, ¶ 44).

fits of continued employment ... including ... the ability to participate in the management of [Patient First], thereby increasing the value of his ownership [therein]." (Complaint, ¶¶ 49–55).

Storey also claims that, after his termination, "Patient First failed to provide [him with] notices of meetings of shareholders as required by the By–Laws of the company." In addition, although he was entitled under the Stock Agreements to exercise his stock options within three months after the termination of his employment, Storey claims that the defendants prevented him from doing so. Specifically, Storey claims that, by letter dated February 5, 1998, he attempted to exercise his options pursuant to the terms of the Stock Agreements and, also in that letter, requested information needed to determine the fair market value of Patient First's stock. Patient First initially failed altogether to provide Storey with such information and, later, provided him with information that did not fairly reflect the actual value of the stock. Although it has not disputed Storey's entitlement thereto, Patient First has not paid him any stock or money pursuant to the Stock Agreements. (Complaint, ¶¶ 56–62).

## B. The Procedural History Of Storey's Legal Actions

On November 9, 1999, Storey filed a Motion for Judgment in the Circuit Court of Henrico County, Virginia (the "State Court action") against Patient First, Sowers, Morrison, M. Frank Gorse, Jr., and two other members of Patient First's Board of Directors (collectively, the "State Court defendants"). That Motion for Judgment asserted the following ten claims against those defendants: (I) breach of contract; (II) tortious interference with contract; (III) common law wrongful discharge; (IV) fraud; (V and

VI) breaches of fiduciary duty; (VII) defamation; (VIII) trespass and conversion; (IX) statutory conspiracy causing business injury; and (X) a claim for declaratory relief with respect to Storey's stock ownership rights.

The State Court defendants filed a Counterclaim against Storey and a Demurrer and Special Plea in Bar (the "demurrer") as to all of the counts in the Motion for Judgment except those in which Storey alleged breach of contract or sought declaratory relief. Storey filed a motion for leave to take a nonsuit as to some or all of the claims in his Motion for Judgment. On November 2, 2001, the Circuit Court heard argument on the demurrer, and, on November 20, 2001, that court entered an order (the "November 20 Order"). That order: (1) granted Storey's motion for leave to take a nonsuit as to, and, accordingly, dismissed without prejudice, the fraud, breach of fiduciary duty, defamation, and declaratory relief claims; (2) granted Storey leave to file an Amended Motion for Judgment as to the common law wrongful discharge claim; (3) dismissed from the suit several of the State Court defendants; (4) granted the remaining State Court defendants leave to withdraw their demurrer as to Storey's trespass and conversion claim; (5) sustained that demurrer as to Storey's statutory business conspiracy claim, dismissed that claim with prejudice, and denied Storey leave to amend it; (6) took under advisement the demurrer as to Storey's tortious interference with contract claim (and granted the parties additional time in which to file memoranda with respect to that claim); and (7) overruled Storey's objections to the November 20 Order.

On December 28, 2001, Storey filed his original complaint in this Court. On January 2, 2002, and before it ruled on the State Court defendants' demurrer as to

Storey's tortious interference with contract claim, the state court granted Storey's motion for leave to take a nonsuit as to the remaining claims presented in his motion for judgment. On January 17, 2002, the state court also granted Patient First's motion for leave to take a nonsuit as to its counterclaim. On February 15, 2002, Storey filed a Notice of Appeal to the Supreme Court of Virginia with respect to the November 20 Order; however, counsel all agree that, subsequently, Storey voluntarily dismissed that appeal. *See infra*, note 40.

On February 27, 2002, Storey filed his First Amended Complaint in this Court. In it, Storey asserts the following nine claims: Count I—violation of the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h); Count II—breach of contract; Count III—tortious interference with business relationship; Count IV—wrongful discharge in violation of the public policy and laws of the Commonwealth of Virginia; Count V—breach of fiduciary duty;[9] Count VI—trespass and conversion; Count VII—common law conspiracy; Count VIII—statutory conspiracy in violation of Va.Code §§ 18.2–499 and 18.2–500;[10] and Count IX—a claim for declara-

tory relief with respect to the valuation of his Patient First stock (pursuant to the Stock Agreements).[11]

In his prayer for relief, Storey requests the following remedies: (1) compensatory damages in an amount exceeding $1 million (to be determined at trial), punitive and trebles damages together with pre and post-judgment interest thereon, and attorney's fees and costs; (2) a declaration of rights as requested in the claim for declaratory relief; and (3) other relief as the Court deems appropriate.

On March 8, 2002, and pursuant to Fed. R.Civ.P. 12(b)(6), the defendants filed the pending motion, in which they request that the Court dismiss Counts I, II (in part), III, IV, V, VII, and VIII of Storey's Complaint because those counts fail to state claims upon which relief can be granted.[12]

## DISCUSSION

### A. Standard Of Review Under Fed. R.Civ.P. 12(b)(6)

In considering a motion to dismiss a complaint for its "fail[ure] to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the

9. Storey asserts this claim against only defendant, Sowers.

10. Storey asserts this claim against only defendants, Sowers and Morrison.

11. Storey asserts this claim against only defendant, Patient First.

12. On March 8, 2002, the defendants filed a Counterclaim against Storey in this Court (the "Counterclaim"). That Counterclaim alleged, among other things, that Storey had misrepresented his salary to a subordinate employee of Patient First for the purpose of effecting an unauthorized increase in his salary. (Counterclaim, ¶ 5). The Counterclaim articulated the following claims against Storey: Count I—Breach of Contract and Fiduciary Duties; and Count II—Conversion and Fraud.

On March 27, 2002, and pursuant to Fed. R.Civ.P. 12(b)(6), Storey filed a Motion to Dismiss Count II of the Counterclaim insofar as that count alleged a claim for fraud. On May 10, 2002, the Court convened the parties for a hearing on their respective motions to dismiss and, at the conclusion of that hearing, and orally from the bench, the Court expressed its opinion that Count II of the Counterclaim failed to state a claim for fraud.

By Order issued May 10, 2002, Count II of the Counterclaim was dismissed without prejudice and the defendants were granted leave to file an amended Counterclaim in which a claim for fraud is articulated in a separate count. On May 20, 2002, the defendants filed a First Amended Counterclaim in accordance with the May 20 Order, and, on June 7, 2002, Storey filed a response thereto.

complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *see, e.g., In re MicroStrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 627–28 (E.D.Va.2000); *Higgins v. Medical College,* 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *America Online, Inc. v. Great-Deals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va. 1999) (*citing Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)); *see MicroStrategy,* 115 F.Supp.2d at 627–28; *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (explaining that complaint should be construed liberally). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses[.]" *Republican Party,* 980 F.2d at 952; *see also Edwards v. City of Goldsboro,* 178 F.3d 231, 243–44 (4th Cir.1999).

These precepts govern the ensuing assessment of the motion to dismiss all, or part of, seven counts of the Complaint.

## B. The Defendants' Motion To Dismiss

As stated above, the defendants have moved for dismissal of Counts I, II (in part), III, IV, V, VII, and VIII of the Complaint.[13] Each is discussed below.[14]

### 1. Count I—Violation Of The False Claims Act

In Count I of the Complaint, Storey alleges that his termination by Patient First was on account of, and in retaliation against, "his lawful acts done in furtherance of an action under the False Claims Act, 31 U.S.C. § 3729, *et seq.*," and that, as such, the defendants violated the anti-retaliation provision of statute. (Complaint, ¶¶ 64–65). The defendants have moved for dismissal of Count I on the ground that Storey's retaliation claim is barred by the applicable statute of limitations, which they contend is not found on the face of the False Claims Act, but, instead, is determined according to state law.

31 U.S.C. § 3730(h), upon which Storey relies in Count I of the Complaint, states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or

**13.** With respect to the defendants' motion to partially dismiss Count II of the Complaint, which alleges a claim for breach of contract, that motion sought dismissal of Count II insofar as it asserted that certain alleged facts each constituted separate and distinct contractual breaches.

In his brief in opposition to the defendants' motion to dismiss, and at oral argument on May 10, however, Storey represented that each of the facts that he alleged, and referred to, in Count II did not constitute separate and distinct breaches of contract. Instead, Storey explained that he included in Count II the alleged facts as to which the defendants sought dismissal simply because those facts were "relevant" to his breach of contract claim.

Accordingly, and for the reasons set forth orally from the bench during the May 10, 2002 hearing, the defendants' motion to dismiss Count II is denied as moot.

**14.** In the course of preparing this opinion, it became apparent that additional research and analysis was required before the issues respecting dismissal of Count VII, Storey's common law conspiracy claim, properly could be resolved. Accordingly, in a telephone conference held on June 12, 2002, the parties were asked to submit additional briefing respecting Count VII. After the parties have submitted those supplemental briefs, an additional Memorandum Opinion shall issue forthwith in which the motion to dismiss, as it pertains to Count VII, will be adjudicated.

in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

Section 3730(h) does not contain its own separate statute of limitations. Rather, the only statute of limitations provided in the False Claims Act appears at 31 U.S.C. § 3731(b), which provides:

A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

There are three types of "civil actions" that may be brought "under" 31 U.S.C. § 3730. First, the Attorney general may bring a civil action pursuant to § 3730(a) after determining that a violation of 31 U.S.C. § 3729 is occurring or has occurred.[15] Second, a *qui tam* plaintiff or "relator" (i.e., a person suing on behalf of the United States) may bring an action pursuant to § 3730(b). Third, an employee who is retaliated against in violation of § 3730(h) may bring a suit pursuant to that provision.

■ The defendants argue that, because neither 31 U.S.C. § 3730 nor 31 U.S.C. § 3731 provides a statute of limitations that expressly applies to retaliation claims brought pursuant to § 3730(h), and, because application of the express limitation provisions in § 3731 would lead to absurd results, Congress must have intended for courts to refer to state law to determine the period within which plaintiffs must file such retaliation claims.[16] The defendants also point to the legislative history of the False Claims Act, as other courts addressing this issue have considered that history, in support of their argument. Storey, on the other hand, contends that the plain language of the statute provides the statute of limitations (*i.e.*, the six year period set forth in § 3731(b)(1)) that Congress

---

**15.** 31 U.S.C. § 3729 sets forth the types of conduct that the False Claims Act proscribes (except for retaliation, which is proscribed in § 3730(h)), which basically are any knowing submission of false or fraudulent claims to the United States. That provision also prescribes punishments applicable to persons found to have violated, and defines certain terms as they are used in, the False Claims Act.

**16.** *See e.g., G.P. Reed v. United Transportation Union,* 488 U.S. 319, 323–24, 109 S.Ct. 621, 625, 102 L.Ed.2d 665 (1989) (explaining that, where Congress fails to supply an express statute of limitations when it creates a federal cause of action, the Supreme Court generally has concluded that Congress intended that courts would apply the most closely analogous statute of limitations under state law).

intended to govern the timeliness of retaliation-plaintiffs' claims.

The decisional law on this issue is sparse and divergent. In support of their position, the defendants cite *United States ex rel. Lujan v. Hughes Aircraft,* 162 F.3d 1027 (9th Cir.1998); *United States ex rel. Satalich v. City of Los Angeles,* 160 F.Supp.2d 1092 (C.D.Cal.2001); *United States ex rel. Truong v. Northrop Corporation,* No. CV 88–967 MRP, 1991 WL 496831 (C.D.Cal. Nov. 26, 1991) (unpublished); and *United States ex rel. Ackley v. IBM,* 110 F.Supp.2d 395 (D.Md.2000). In *Hughes Aircraft,* the Ninth Circuit rejected a "plain meaning" interpretation of 31 U.S.C. § 3731(b)(1), in part, because, whereas the statute of limitations set forth therein is "6 years after the date on which the violation of section 3729 is committed", retaliation in violation of 31 U.S.C. § 3730(h) "does not constitute a violation of section 3729." *Hughes Aircraft,* 162 F.3d at 1034.[17]

The court, in *Hughes Aircraft,* considered the legislative history of the False Claims Act, and it noted that, before 1986, 31 U.S.C. § 3731 provided that "[a] civil action under section 3730 of this title must be brought within 6 years from the date the violation is committed." In the Ninth Circuit's view, that implied that "all claims had a six-year window of opportunity under the old law." *Hughes Aircraft,* 162 F.3d at 1034. However, Congress amended the False Claims Act in 1986, and this amendment added both the retaliation claim provision at § 3730(h) and the current statute of limitations provision at § 3731. *See* False Claims Amendment Act of 1986, Pub.L. 99–562, 100 Stat. 3153. The Ninth Circuit analyzed these modifications in the following terms:

If Congress had wanted to retain a six-year statute for all actions under section 3730, including retaliation claims, it would have left the pre–1986 language of section 3731(b) intact when it enacted the 1986 amendments to the FCA. Instead, Congress, while adding a provision for retaliation claims under 3730(h), narrowed the application of the six-year statute of limitations to violations of section 3729. Section 3729 specifically and strictly addresses false claims, not retaliation claims.

That Congress was specifically concerned with false claims in its 1986 amendments to the statute of limitations is further illustrated by its addition of section 3731(b)(2). This section provides an alternative to the six-year statute of limitations for false claims, namely a period of no more than three years after material facts should have been known by the relevant government official, but never longer than ten years after the violation was committed. 31 U.S.C.A. 3731(b).... The legislative history to this section indicates that this change was enacted to "ensure the Government's rights are not lost through a wrongdoer's successful deception," because "fraud is, by nature, deceptive...." S.Rep. No. 99–345, at 15 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5280. The same rationale is inapposite to a private claim for retaliation. There is nothing covert or deceptive about retaliation—the victim feels its sting immediately. In the absence of some meaningful indication to the contrary, we must therefore presume that, in amending section 3731(b) so that the limitation runs only from the date of a violation of section 3729, Congress did

---

**17.** The court expressly declined to follow the decision of the Seventh Circuit in *Neal v. Honeywell,* 33 F.3d 860 (7th Cir.1994).

*Hughes Aircraft,* 162 F.3d at 1034, n. 4. *See supra.*

not intend that the statute apply to section 3730(h).

*Id.* at 1034–35. Thereupon, the Ninth Circuit determined that, under the teachings of the Supreme Court of the United States, the appropriate course was to refer to state law to identify the relevant statute of limitations. *Id.* at 1035. It "agree[d] with the district court that the most analogous statute of limitations under California law is the one-year period applicable to wrongful termination in violation of California public policy." *Id.*[18]

The United States District Court for the District of Maryland also has "assum[ed] without deciding" that the statute of limitations applicable to a claim arising under 31 U.S.C. § 3730(h) should be determined by reference to state law—specifically, Maryland's three-year limitations period for tort (*i.e.*, wrongful discharge) actions. *See United States ex rel. Ackley v. IBM*, 110 F.Supp.2d 395, 401–05 (D.Md.2000).[19] The court agreed with the defendants in that case that application of the limitation provisions that Congress included in the False Claims Act might lead to illogical results. It discussed that problem in the following terms:

> An employee ... could be retaliated against even if false claims [pursuant to 31 U.S.C. § 3729] were never actually made or not proven or if the timing of their occurrence were indeterminate. What, in those instances, would be the date on which the six-year clock on a retaliation claim might begin to run? On the other hand, an employee could be retaliated against more than six years after the violation of [s]ection 3729, whether the violation occurred or not. By [the plaintiff's] argument, limitations would have run on the claim.

*Id.* at 402. Dissatisfied with this result, the court opined that state law provided the appropriate statute of limitations. Specifically, the court noted that "[c]ourts that have applied state limitations statutes to [s]ection 3730(h) claims have chosen wrongful discharge from employment as the proper analogue to retaliation." *Id.* at 404. (citations omitted). The defendants urge the same result here.

In contrast, Storey presses for application of the "plain meaning" of the text of the False Claims Act, and he cites *Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th Cir. 1994), in support of that view. In *Neal*, the Seventh Circuit opined that it was "both possible and desirable to read [the False Claims Act] exactly as written." *Id.* at 862. Rejecting the defendants' arguments that it would be "absurd ... to read the statute so that the time to file suit may

**18.** Other district courts in California have taken the same view both before and after *Hughes Aircraft* was decided. *See e.g., United States ex rel. Truong v. Northrop Corp.*, 1991 WL 496831, at *1–3 (discussing "bizarre results" that plain meaning view of statute could entail because limitations period is unrelated to an employee's date of termination, because no government official has responsibility over retaliation claims, and because individual victims of retaliation may have widely varying periods of limitation); *United States ex rel. Satalich*, 160 F.Supp.2d at 1111 (applying the controlling precedent of *Hughes Aircraft*).

**19.** The district court in Maryland rejected the defendant's contention that the statute of limitations should be determined by reference to the law of New York, where the alleged retaliation in that case had taken place. It applied federal choice of law rules and determined, as a matter of law, that the limitations period of the most analogous claim of the *forum* state applied. Having so decided, it was obvious that the plaintiff's claim was timely under *either* the six year limitations period codified at 31 U.S.C. § 3731(b)(1) or the three year period applicable to tort actions in Maryland. Therefore, in that court's view, it was not necessary to decide which of those two periods applied.

expire before the retaliation occurs[,]" the court explained that it found "no absurdity in the statute." *Id.* at 865. The court reasoned that "[s]tatutes of repose, increasingly common in tort cases, have the potential to block litigation before the tort occurs." *Id.* (pointing to product defect and securities law litigation as examples). The court went on to observe that, if this is what Congress had intended to accomplish by way of the limitation period contained in the False Claims Act, "that would not condemn [those provisions] as absurd. It would show only that Congress had opted for simplicity of administration." *Id.* (noting that "[i]t is easier to determine the date of a false claim than to pin down the time of retaliatory acts[.]"). *Id.* Thus, the court in *Neal* held that the six year statute of limitations provided for in 31 U.S.C. § 3731(b)(1) applies to plaintiffs who sue under 31 U.S.C. § 3730(h). *Id.* at 866.

Other courts have decided this issue in accord with the decision in *Neal. See e.g., Kowalski v. Alpha Kappa Alpha Sorority,* 993 F.Supp. 619, 620–21 (N.D.Ohio 1997) (borrowing statute of limitations from False Claims Act for application to claim of retaliation under Major Fraud Act, 18 U.S.C. § 1301, and implying, without substantial analysis, that six year limitations period in False Claims Act would apply to "protect[ ] employees who identify and cooperate in investigations of fraud against the United States."); *Grand ex rel. United States v. Northrop Corporation,* 811 F.Supp. 333, 335–37 (S.D.Ohio 1992) (holding that six year limitations period set forth in 31 U.S.C. § 3731(b)(1) applied to plaintiff suing under 31 U.S.C. § 3730(h),

recognizing that "strange problems and questions may arise ... under particular sets of facts[,]" but holding that, under the facts of the case before it, no such problem presented itself, therefore, plain meaning rule should prevail).

■ Analysis of these different jurisprudential rationales leads to the conclusion that the six year statute of limitations set forth in 31 U.S.C. § 3731(b)(1) applies to Storey's retaliation claim.[20] Several considerations support this conclusion. First, it is well-settled that "[c]ourts must apply the plain language of a statute except in the rare circumstance when there is a clearly expressed legislative intent to the contrary or when a literal application would frustrate the statute's purpose or lead to an absurd result." *National Coalition for Students with Disabilities Education and Legal Defense Fund v. Allen,* 152 F.3d 283, 288 (4th Cir.1998) (*citing In re Vial,* 115 F.3d 1192, 1196 (4th Cir.1997) (*en banc* )); *see also United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989). Here, by the plain language of § 3731(b), the limitations periods contained in that section apply to "[a] civil action under section 3730[.]" Retaliation claims, such as Storey's, are created by subsection (h) of 31 U.S.C. § 3730, hence, and as noted above, such a claim is one that is "under section 3730." Therefore, the text of § 3731(b), given its plain meaning, contains the limitations period applicable to claims brought pursuant to § 3730(h). Congress could have, but did not, provide different statutes of limitations for different types of claims arising

---

**20.** Because there is no "official of the United States charged with responsibility to act in the circumstances" that are presented in a typical retaliation case, and because the three-year limitations period provided at 31 U.S.C. § 3731(b)(2) is triggered by the knowl-

edge of certain material facts by such an official, there is no sound basis upon which to hold that § 3731(b)(2) provides the limitations period applicable to Storey's retaliation claim. Neither party in this case has argued to the contrary.

under the False Claims Act. Where, as here, the plain text of a statute is unambiguous, courts are not at liberty to ascribe it other than its ordinary meaning absent the type of extraordinary circumstances noted above. *See Grand ex rel. U.S.*, 811 F.Supp. at 336 (stating that, because "Congress did not specify parts or subsections of [§ ] 3730 which ha[ve] a different statute of limitations[,]" the "plain language of the statute" compels the inference "that Congress intended all parts of 31 U.S.C. § 3730 to have the same statute of limitations.").

The defendants invoke the second basis upon which a court may depart from the plain language of a statute—that is, where application of the express terms of that statute would lead to an absurd result. However, the defendants have failed to demonstrate precisely how or why such absurdity obtains under a "plain meaning" interpretation of 31 U.S.C. § 3731(b)(1). As noted above, and as discussed in *United States ex rel. Ackley*, they posit that employees might be retaliated against more than six years after their employer commits a violation of 31 U.S.C. § 3729, or that such retaliation could occur even absent an actual violation of § 3729. Under such circumstances, victims of retaliation would be prohibited from pursuing their federal claims through no fault of their own, which the defendants view as an "absurd result."

The court in *Neal* addressed that concern, however, and it reasoned that, rather than "condemn[ing] the False Claims Act as absurd", the express limitations scheme reflects "that Congress has opted for simplicity of administration." *Neal*, 33 F.3d at 865. With respect to the problem of retaliation that occurs more than six years after a violation of § 3729, the *Neal* court properly recognized that Congress may impose statutory mechanisms that, in some circumstances, will operate to bar litigation before a claim ever arises. *See id.* To illustrate this point, the court pointed to statutes of repose, which "have the potential to block litigation before the tort occurs." *Id. See generally First United Methodist Church of Hyattsville v. United States Gypsum Co.*, 882 F.2d 862, 865 (4th Cir.1989) (*citing Goad v. Celotex Corp.*, 831 F.2d 508, 510–12 (4th Cir.1987) (discussing fundamental difference between a statute of limitations and a statute of repose)).[21] Much in the manner of a statute of repose, the limitations period codified at § 3731(b)(1) presents the inherent possibility that a plaintiff may be barred from court before he or she ever suffers an injury that otherwise would have been redressible. As explained in *Neal*, that alone does not render the result absurd, especially where, as here, the limitations period is a long one.

As for the second problem that the defendants identify—that an employer might retaliate against an employee even absent any actual (or proven) violation of § 3729—the *Neal* decision also points out that § 3730(h) refers to "an action filed or

---

**21.** Notwithstanding its reference to statutes of repose, however, it is fairly clear that the court in *Neal* considered that the provisions of 31 U.S.C. § 3731(b) technically constitute a statute of limitations, and not a statute of repose. This is particularly clear in perspective of the court's brief discussion of equitable tolling, to which it opined § 3731(b) would be subject. *See id.* at 866. Although the doctrine of equitable tolling applies to statutes of limitation, it does not apply to statutes of repose. *See e.g., First United Methodist Church of Hyattsville*, 882 F.2d at 865–66.

It is likely that the reference to statutes of repose, in the *Neal* decision, was intended merely to reflect, by analogy, the fact that Congress properly employs a range of statutory mechanisms when it reconciles the competing policy interests involved in creating, defining, and limiting causes of action.

to be filed[.]" *Id.* at 863–64 (emphasizing that "[t]he statute expressly covers investigatory activities preceding litigation."). *See also Childree v. UAP/GA AG CHEM, Inc.,* 92 F.3d 1140, 1146 (11th Cir.1996) (agreeing with the *Neal* decision that the False Claims Act proscribes retaliation "not only where a false claims action is actually filed, but also where the filing of such action, by either the employee or the government, was a 'distinct possibility'...."); *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 187–88 (3d Cir. 2001); *Haley v. Retsinas,* 138 F.3d 1245, 1250–51 (8th Cir.1998); *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1522–23 (10th Cir. 1996). If the limitations period contained in § 3731(b)(1) applies to a retaliation claim in which the predicate for the alleged retaliation is the employee's assistance in proving that his employer committed a violation of § 3729, then, under the plain language of § 3730(h) (and the cases cited above interpreting that language), that limitations period also would apply to a retaliation claim in which the underlying facts did not include such a proven violation.

That, of course, begs the very question under review—whether the limitations period set forth at § 3731(b)(1) applies to claims brought pursuant to § 3730(h). As explained above, it does. The decision in *Neal* is well-reasoned and comports with the fundamental tenet of statutory interpretation that, wherever possible, courts should construe statutes according to their terms. In addition, and as noted in Grand ex rel. *United States,* "a relator's *qui tam* claim is often interrelated to his claim for retaliation." 811 F.Supp. at 336. Thus,

"[g]iven the relatedness of the two actions, Congress rationally concluded that the two actions should have identical statutes of limitation." *Id.; see also Neal,* 33 F.3d at 865–66 (stating that "[i]n most cases ... the false claims, the reports, and the retaliation will occur close in time, so starting the period of limitations with the false claim rather than the retaliation will leave employees ample time to protect their rights.").[22]

Finally, as the court in *Grand ex rel. United States,* noted, it would be particularly imprudent to disregard the plain language of § 3731(b)(1) where, as here, "applying the plain meaning of [the statute] would not lead to an absurd result in *this* case." 811 F.Supp. at 336. As that court properly recognized:

[S]trange problems and questions may arise in the application of the plain meaning of many statutes under particular sets of facts. Still, the task of this Court is not to answer every conceivable question or hypothetical about a statute. (citations omitted). Instead, it is this Court's duty to interpret and apply a statute to the facts of the case before it. (citation omitted).

*Id* at 336–37. There may be circumstances in which application of the Congressionally-prescribed limitation periods contained in 31 U.S.C. § 3731(b) would engender uniquely harsh, unfair, or even "absurd" results. But nothing of the sort obtains in this case. To the contrary, as applied to the allegations set forth in Storey's Complaint, and with respect to his claim under § 3730(h), the language of § 3731(b)(1) clearly furthers the purposes underlying the False Claims Act.

Storey alleges that he was in the process of investigating violations of the False

**22.** As noted above, in *Neal,* Judge Easterbrook also recognized that "[i]t is possible ... that equitable tolling or estoppel would apply to § 3731(b)(1) if the [employer] patiently

waited until six years from the false claim and then sacked the troublesome employee." 33 F.3d at 866 (citing cases). *See supra,* note 22.

Claims Act that his employer, Patient First, may have committed, and that he was endeavoring to "blow the whistle" on such unlawful conduct. He claims that the defendants improperly terminated his employment, in large part, in retaliation for his actions to that end. Congress reasonably could have considered that granting employees such as Storey six years (from the date on which his employer submitted a claim that Storey had reason to believe violated 31 U.S.C. § 3729) to bring a retaliation suit would foster the underlying purpose of the False Claims Act, which is "to provide for restitution to the government of money taken from it by fraud." *United States ex rel. Augustine v. Century Health Services, Inc.*, 289 F.3d 409 (6th Cir.2002) (unpublished) (*citing United States v. Hess*, 317 U.S. 537, 551, 63 S.Ct. 379, 388, 87 L.Ed. 443 (1943)). There is nothing illogical or absurd about that result.

According to the Complaint, and pursuant to the language of 31 U.S.C. § 3731(b)(1), the statute of limitations on Storey's retaliation claim began to run (at the earliest) "[i]n early 1997[,]" when "Storey reported to Sowers and Morrison concerns that were related to him by other" Patient First employees. (Complaint, ¶ 22). Because Storey filed this action on December 28, 2001, well within the applicable six year limitation period contained in § 3731(b)(1), his claim for retaliation under the False Claims Act is timely. For that reason, the defendants' motion to dismiss Count I of the Complaint is denied.

## 2. Count III – Tortious Interference With Business Relationship

In Count III of the Complaint, Storey alleges that "Sowers and Morrison tortiously interfered with [his] relationship with Patient First" by scheming to terminate his employment based on false information and in violation of his employment contract. Storey also alleges that those defendants "were acting to advance their own personal interests rather than any legitimate business purpose and thus were acting outside the scope of their employment with `Patient First." (Complaint, ¶¶ 69–73). The defendants have moved for dismissal of Count III on the ground that, whereas a plaintiff must allege the existence of three separate actors in order to plead a cognizable claim for tortious interference, Storey's allegations involve only two parties—Storey and Patient First.

■ It is well-settled in Virginia that, to establish a prima facie claim for tortious interference with contract, a plaintiff must plead the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See e.g., Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97 (Va.1985). In addition, where the contract at issue was terminable "at will", the Supreme Court of Virginia has required that the plaintiff allege (and prove) that "the acts or methods used for the interference [were] themselves 'improper.' " *Maximus, Inc. v. Lockheed Information Management Systems Co.*, 254 Va. 408, 413–14, 493 S.E.2d 375 (Va.1997).[23]

---

**23.** In *Duggin v. Adams*, 234 Va. 221, 226–228, 360 S.E.2d 832 (Va.1987), the Supreme Court of Virginia explained that "[m]ethods of interference considered improper are those means that are illegal and independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* at 227, 360 S.E.2d 832. The Court also listed the

■ In the jurisprudence of tortious interference, it is axiomatic that a party cannot interfere with his own contract. Rather, a tortious interference claim requires the existence of three actors—the two parties to the contract and a third-party who interferes with, or induces one of the parties to breach, that contract.[24] *See e.g., Fox v. Deese,* 234 Va. 412, 427, 362 S.E.2d 699 (Va.1987); *Levine v. McLeskey,* 881 F.Supp. 1030, 1055–56 (E.D.Va.1995); *Flinders v. Datasec Corp.,* 742 F.Supp. 929, 935 (E.D.Va.1990); *Haigh v. Matsushita Electric Corp. of America,* 676 F.Supp. 1332, 1349 (E.D.Va.1987) (*citing Welch v. Kennedy Piggly Wiggly Stores, Inc.,* 63 B.R. 888, 894 (W.D.Va.1986)). However, "if it can be shown that an agent of a party to the contract was acting outside the scope of his employment in tortiously interfering with such contract, then the aggrieved party may be entitled to recover...." *Wuchenich v. Shenandoah Memorial Hospital,* 215 F.3d 1324, 2000 WL 665633, at **17 (4th Cir.2000) (unpublished); *see also Fox,* 234 Va. at 427, 362 S.E.2d 699 (noting that evidentiary hearing was required to determine whether agent was acting within scope of employment, such that he could not be held to have interfered with a contract to which his employer was a party); *Haigh,* 676 F.Supp. at 1349.

■ In their motion, the defendants are challenging only whether, in Count III, Storey sufficiently has pleaded the existence of three actors.[25] That is to say, the defendants characterize Sowers and Morrison as agents of Patient First who (contrary to Storey's argument) were acting well within the scope of their employment when they took the actions that Storey alleges, and challenges, in Count III.

The defendants point to the decision in *Haigh,* 676 F.Supp. at 1341–43, arguing that this case is nearly identical to that one. In *Haigh,* the plaintiff alleged that, "[b]y slandering [the plaintiff], conspiring to injure his business reputation, unlawfully demoting, and constructively terminating his employment, Panasonic, [and nine individual employees of Panasonic] tortiously interfered with [the plaintiff's] contractual rights concerning his employment." *Id.* at 1349. The court dismissed that claim because the alleged actions, illegal though they may have been, nonetheless were alleged to have been "devised by

following examples of methods that may be considered improper: violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, and methods that violate an established standard of a trade or profession, involve unethical conduct, sharp dealing, overreaching, or unfair competition.

24. The Restatement (Second) of Torts § 766 (1977), entitled "Intentional Interference with Performance of Contract by Third Party", describes this tort in the following manner:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) *between another and a third person* by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. (emphasis supplied).

25. In a footnote in their brief in support of their motion to dismiss, the defendants also argue that Storey cannot support his allegations in Count III with references to certain communications between Sowers and Patient First's corporate counsel because, in the defendants' view, any such conversations are protected by the attorney-client privilege. Storey correctly has responded by pointing out that, even if this is true, a motion to dismiss pursuant to Rule 12(b)(6) generally is not an appropriate forum in which to resolve issues respecting the attorney-client privilege.

Panasonic officials to further Panasonic's interests...." *Id.*

Storey argues that, in Count III, and unlike the plaintiff in *Haigh*, he properly has alleged that Sowers and Morrison in fact were acting outside the scope of their employment such that they should be viewed as separate persons (apart from Patient First) for purposes of analyzing his tortious interference claim. In support of this argument, Storey points to paragraphs in the Complaint in which he alleges the following facts: (1) although Storey did present the Alfine investment opportunity to Sowers, Sowers rejected that idea as "throwing money away" (which establishes a predicate for the later allegation that Sowers' assertion that Storey had usurped a corporate opportunity was a lie); (2) Sowers directed an employee of Patient First "surreptitiously to obtain after business hours a copy of Storey's private computer files"; and (3) Sowers did not pursue legal action respecting usurpation of corporate opportunity, or breach of fiduciary duty, against any of the other Patient First employees who invested in Alfine (besides Storey).[26] Storey also liberally has sprinkled the Complaint with the allegation that, when they took the actions of which he complains, Sowers and Morrison were acting outside the scope of their employment with Patient First and to further their own personal interests. (Complaint, ¶¶ 39, 70, 72, 74).

Storey asserts that, in perspective of these allegations, his tortious interference claim is less like the one that the court rejected in *Haigh*, and more akin to the one that survived the defendant's motion to dismiss in *Warner v. Buck Creek Nursery, Inc.*, 149 F.Supp.2d 246, 265–66 (W.D.Va.2001). In that case, the court determined that the plaintiff's claim sufficiently alleged that the defendant had act-

ed outside the scope of her employment (and that it satisfied the minimal requirements of notice pleading) where the plaintiff alleged merely that the officer manager of the corporate defendant intentionally interfered with the contract at issue (by directing fabricated charges of theft at him) "because of her 'personal dislike' for him[.]" *Id.*

Like the complaint in *Warner*, Storey's Complaint passes muster under the liberal pleading requirements of Fed.R.Civ.P. 8. Storey repeatedly has alleged that the individual defendants were acting in their personal capacity, outside the scope of their employment, and for their own reasons (unrelated to the legitimate interests of Patient First). Moreover, a fair reading of the Complaint as a whole permits the reasonable inference that, when they took the actions upon which Storey bases his claim, Sowers and Morrison were motivated by an intent to protect themselves from liability of the sort that might ensue incident to Storey's disclosures respecting the corporate conduct of Patient First. Under these circumstances, and especially where Storey's termination would facilitate continuation of the alleged improprieties being undertaken at Patient First, Storey sufficiently has alleged that Sowers and Morrison acted outside the scope of their employment with Patient First when they took the actions that he alleges constituted tortious interference with his employment contract. For this reason, Storey properly has pleaded the existence of three actors in Count III and the defendants' motion to dismiss that count is denied.

### 3. Count IV – Wrongful Discharge In Violation Of Virginia Public Policy

In Count IV of the Complaint, Storey alleges that "Sowers caused Storey's em-

---

**26.** Complaint, ¶¶ 17–19, 41–42, 44.

ployment with Patient First to be terminated because Storey ... properly reported ... potential violations of state and federal law.... Such termination violates the public policy and laws of [Virginia] .... and constitutes a wrongful discharge." [27] (Complaint ¶ 77). The defendants seek dismissal of Count IV on the ground that Storey has failed to identify a Virginia statute that articulates, or otherwise expresses, a Virginia public policy that was violated by his termination.[28]

### a. The Nature Of *Bowman* Claims

Storey premises his claim in Count IV upon a doctrine that the Supreme Court of Virginia first recognized in *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (Va.1985). That doctrine, pursuant to which plaintiffs may plead what have become known as "*Bowman* claims", represents a limited exception to the general principles of at-will employment that are firmly entrenched within Virginia jurisprudence. Recognizing that Virginia's commitment to the employment-at-will rule is not absolute, the Supreme Court of Virginia, in *Bowman,* created "an exception to the employment at-will doctrine limited to discharges which violate public policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety,

or welfare of the people in general." *Miller v. SEVAMP, Inc.*, 234 Va. 462, 468, 362 S.E.2d 915 (Va.1987). This exception is "not so broad as to make actionable those discharges of at-will employees which violate only private rights or interests." *Id.*

As explained in *Anderson v. ITT Industries, Corp.*, 92 F.Supp.2d 516, 520 (E.D.Va.2000), "[s]ince the *Bowman* decision ... the public policy exception has evolved significantly, both in the courts and in the legislature, but it has remained a relatively narrow exception, and attempts to expand the doctrine have met with resistance...." [29] As a threshold matter, a plaintiff attempting to assert a wrongful discharge claim pursuant to *Bowman* must identify a Virginia statute that the employer-defendant violated by terminating the plaintiff. See e.g., *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94, 98–99, 465 S.E.2d 806 (Va.1996); *Warner v. Buck Creek Nursery, Inc.*, 149 F.Supp.2d 246, 261 (W.D.Va.2001); *Perry v. American Home Products Corp.*, 1997 WL 109658, at *4 (E.D.Va. Mar. 4, 1997). It is worth emphasizing that a claim under *Bowman* "must find root in a *state* statute[ ]"; it cannot have its genesis in an act of Congress. *McCarthy v. Texas Instruments, Inc.*, 999 F.Supp. 823, 829 (E.D.Va. 1998); *see also Oakley v. The May Department Stores, Co.*, 17 F.Supp.2d 533, 536

---

**27.** It is worth noting that, although Storey has not limited the applicability of Count IV to Sowers (as he has done with respect to other counts in the Complaint that implicate only one or some of the defendants), and although there are allegations that implicate the corporate defendant, there are no allegations in paragraphs 76–79 that refer to defendant, Morrison, and, indeed, it appears that Count IV may not be directed against him. That issue, however, could be cleared up in discovery or in an amended pleading.

**28.** The defendants also have premised their motion to dismiss Count IV on the ground that Storey was an at-will employee of Patient First and, as such, he cannot (as a matter of

law) bring a claim for wrongful discharge in Virginia. Because Count IV properly is dismissed based upon the first argument that the defendants have advanced, however, it is not necessary to consider this second argument.

**29.** For an overview of the most important decisions of the Supreme Court of Virginia respecting wrongful discharge claims, as well as general insight into the nature and evolution of the *Bowman* doctrine, *see generally, Rowan v. Tractor Supply, Co.*, 263 Va. 209, 559 S.E.2d 709 (Va.2002); *Leverton v. Allied-Signal, Inc.*, 991 F.Supp. 486 (E.D.Va.1998); *Warner v. Buck Creek Nursery, Inc.*, 149 F.Supp.2d 246 (W.D.Va.2001).

(E.D.Va.1998) (explaining that "Title VII [of Civil Rights Act of 1964] cannot be used to support a *Bowman* claim, because the *Bowman* exception ... is predicated on public policies derived from *Virginia* statutes, not federal laws.") (citations omitted).

However, the Supreme Court of Virginia has restricted the breadth of the *Bowman* doctrine even further, so that not even all Virginia statutes may serve as the predicate upon which a plaintiff may base a wrongful discharge claim. The principles according to which that court has applied, and limited, the *Bowman* doctrine are summarized effectively in the *Anderson* decision, which states:

[W]hile all Virginia statutes[ ] reflect a Virginia public policy to some degree, "termination of an employee in violation of the policy underlying any one of them does not automatically give rise to a ... cause of action for wrongful discharge." (citation omitted). Instead, statutes embodying a public policy sufficient to form the basis of a wrongful discharge claim fall into two categories. (citation omitted). The first is a statute stating explicitly that it expresses a public policy of the Commonwealth. (citation omitted). The second, far more common category consists of statutes that do not explicitly state a public policy, but rather "are designed to protect the property rights, personal freedoms, health, safety or welfare of the people in general," and thereby further an underlying, established public policy that is violated by the discharge at issue. (citations omitted). Yet, even if a statute falls within one of these categories, it may not serve as the basis of a Bowman claim, unless the aggrieved employee also shows that he or she is a member of the class of individuals the public policy is intended to benefit. (citations omitted). In other words, to state a *Bowman* claim, the discharged employee must show that he or she "fell

within the protective reach of the statute which supplied the public policy component of his or her claim." *Leverton v. AlliedSignal, Inc.*, 991 F.Supp. 486, 493 (E.D.Va.1998).

*Id.* at 520–21. Distilling the relevant decisional law to its essence, the court in *Anderson* opined that "to assert a *Bowman* claim, a plaintiff must have either (i) a statutorily-created right which the termination interferes with or violates ... or (ii) a statutorily-imposed duty which the employee is terminated for refusing to violate." *Id.* at 522; *see also Warner,* 149 F.Supp.2d at 261–62.

This synthesis is fully consonant with the recent decision in *Rowan v. Tractor Supply Co.*, 263 Va. 209, 559 S.E.2d 709 (Va.2002), in which the Supreme Court of Virginia was called upon to answer a question of law that the United States District Court for the Western District of Virginia had certified to it. In doing so, the Supreme Court of Virginia described the very limited circumstances under which it has concluded that plaintiffs have stated cognizable *Bowman* claims, and it categorized those circumstances into the following three classes: (1) where "an employer violated a policy enabling the exercise of an employee's statutorily created right[ ]"; (2) where "the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy[ ]"; and (3) where "the discharge was based on the employee's refusal to engage in a criminal act." *Id.* at 213–14, 559 S.E.2d 709.

**b. Whether Storey Can Identify A Virginia Statute That Expresses A Public Policy That the Defendants Violated When They Terminated Him**

■ As the defendants recognize, although Storey alleges that the conduct of

the defendants in effecting termination of his employment "violate[d] the public policy and laws of the Commonwealth of Virginia[,]" nowhere in the Complaint does he identify a specific Virginia statute upon which he might base his *Bowman* claim. Indeed, the Complaint is devoid of reference to any statute other than the federal False Claims Act, which relates only to Count I and which, as noted above, cannot underlie a claim for wrongful discharge under Virginia law.[30] Accordingly, Storey has not satisfied the threshold requirement that he "identify" a Virginia statute that expresses a public policy that the defendants violated by terminating him. Instead, he has alleged merely that he is, or will be, able to do so.

In his brief in opposition to the defendants' motion to dismiss, however, Storey responds to this deficiency by identifying three Virginia statutes, each of which he contends might constitute a predicate for his *Bowman* claim. If, as a matter of law, any of those statutes actually could constitute such a predicate, and if there exists some possibility that Storey's *Bowman* claim might succeed based upon any of those statutes, the proper course would be to grant the defendants' motion to dismiss Count IV, but also to grant Storey leave to amend that count to state a valid claim for wrongful discharge. *See e.g.,* Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Thus, it is appropriate to consider the three statutes that Storey cites in perspective of both the facts alleged in the Complaint and the principles of *Bowman* jurisprudence.

### (1) Va.Code § 32.1–310

The first statute that Storey identifies in support of his *Bowman* claim is Va.Code § 32.1–310, which is entitled "Declaration of Purpose; authority to audit records[.]" That provision states:

> The General Assembly finds and declares it to be in the public interest and for the protection of the health and welfare of the residents of the Commonwealth that a proper regulatory and inspection program be instituted in connection with the providing of medical, dental and other health services to recipients of medical assistance. In order to effectively accomplish such purpose and to assure that the recipient receives such services as are paid for by the Commonwealth, the acceptance by the recipient of such services and the acceptance by practitioners of reimbursement for performing such services shall authorize the Attorney General or his authorized representative to inspect and audit all records in connection with the providing of such services.

This statute clearly espouses a public policy of the Commonwealth—namely, that "a proper regulatory and inspection program be instituted in connection with the providing of medical, dental and other health services to recipients of medical assistance[ ]." However, Storey's claim, if it were premised on the public policy expressed in Va.Code § 32.1–310, would not fit into any of the three recognized classes of *Bowman* claims.

A claim based on § 32.1–310 would not fit into the first class of approved *Bowman* claims because the only affirmative "right" created by the statute is the right of "the Attorney General or his authorized representative to inspect and audit all records" in connection with the provision of, and reimbursement for, medical services.

---

**30.** To be precise, the Complaint also cites 28 U.S.C. § 1331, pursuant to which this Court possesses jurisdiction over this case, and Va. Code §§ 18.2–499 and 18.2–500, under which Storey's statutory conspiracy claim in Count VIII arises. *See supra.*

Similarly, such a claim does not fit into the second class of permitted *Bowman* claims because, although Va.Code § 32.1–310 clearly articulates a public policy of the Commonwealth, there is no viable argument that Storey "was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy[.]" *Rowan,* 263 Va. at 213–14, 559 S.E.2d 709. There simply is no indication, from the text of the statute, or from any other source, that when it enacted Va.Code § 32.1–310, Virginia's General Assembly intended that employees of health care providers who are terminated after discovering that their employer is submitting false claims to the federal government would be entitled to any form of protection thereunder.

Finally, Storey's wrongful discharge claim, if it were premised upon Va.Code § 32.1–310, could not succeed under the third class of cognizable *Bowman* claims— where "the discharge was based on the employee's refusal to engage in a criminal act." *Id.* As noted above, paragraph 77 of the Complaint alleges that "Sowers caused Storey's employment with Patient First to be terminated because Storey . . . properly reported the potential violations of state and federal law[.] Such termination violates the public policy and laws of the Commonwealth of Virginia . . . and constitutes a wrongful discharge." Nothing in the *foregoing* sentences, on its face, amounts to an allegation that the defendants brought about Storey's termination on account of his refusal to engage in a criminal act. There is no allegation that Storey ever was asked, or directed, to submit false claims to the federal government or to engage in any other illegal act. Rather, paragraph 77 reflects merely that the defendants took the actions of which

Storey complains in response to his willingness to disclose their own illegal acts.

In his brief in opposition to the defendants' motion to dismiss, however, Storey argues that, if he "had knowledge of the improper billings and [if] he had continued to accede to [the] submission [thereof] to the Federal Government, he could have become part of criminal activity." Storey states that "[h]is refusal to allow the situation to continue, [and] his investigation of and taking affirmative steps to make a claim under the False Claims Act, resulted in his discharge. Thus his discharge, at least in part, was based on his refusal to take part in a criminal act." In support of this position, Storey cites *Mitchem v. Counts,* 259 Va. 179, 523 S.E.2d 246 (Va. 2000), in which the Supreme Court of Virginia upheld the *Bowman* claim of an employee who was terminated for refusing to submit to her supervisor's sexual advances. The court held that termination of the plaintiff on this basis violated the public policies that are expressed in Virginia statutes proscribing fornication,[31] and lewd and lascivious behavior.[32] In *Anderson,* the court properly analyzed the reasoning underlying the Supreme Court's decision in *Mitchem* when it stated that the plaintiff in that case "was within the protective reach of both statutes . . . because she was arguably under a legal duty, imposed upon her by the statutes, to refrain from doing what her supervisor wanted her to do, namely, engage in fornication and lewd and lascivious conduct." *Anderson,* 92 F.Supp.2d at 522.

Here, in contrast, Va.Code § 32.1–310 imposes no duty, either affirmative or prohibitory, upon Storey. Storey has proffered no legal authority to support his conclusion that, had he "continued to ac-

---

31. *See* Va.Code § 18.2–344.

32. *See* Va.Code § 18.2–345.

cede" to conduct by the defendants that violated the False Claims Act, he "could have become part of criminal activity." *See infra*, note 35. Even accepting that conclusion as true, however, Storey simply cannot connect this potential criminal liability with any duty to disclose fraudulent billings that Va.Code § 32.1–310 imposed upon him. If Storey was subject to such a duty to disclose, that duty existed by virtue of the provisions of the False Claims Act (upon which Storey cannot rely in asserting his wrongful discharge claim), not Va.Code § 32.1–310. Stated differently, even if the defendants in fact terminated Storey because he had refused to engage in an illegal act—submitting false claims to the federal government—the obligation not to engage in that activity did not arise under Va.Code § 32.1–310. Therefore, if he were to rely on Va.Code § 32.1–310, Storey could not base a valid *Bowman* claim upon the third recognized class of such claims.

### (2) Va.Code §§ 18.2–178 And 18.2–260.1

Storey also points to Va.Code §§ 18.2–178 and 18.2–260.1 as statutory bases upon which he might fasten his wrongful discharge claim. These require little attention, however, because they simply do not apply to the conduct for which Storey alleges the defendants effected his termination—his efforts to disclose Patient First's illegal billing practices. Va.Code § 18.2–178 states:

> If any person obtain, by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof; or if he obtain, by any false pretense or token, with such intent, the signature of any person to a writing, the false making whereof

would be forgery, he shall be guilty of a Class 4 felony.

Va.Code § 18.2–260.1 states "[a]ny person who fraudulently falsifies any patient record shall be guilty of a Class 3 misdemeanor."

Under Virginia's wrongful discharge jurisprudence, Storey (in his position as an employee of Patient First) does not fall within the class of persons intended to be protected under these laws because neither law confers a right, and neither law imposes a duty, to disclose Patient First's illegal activities. Storey was not affirmatively required by either law to disclose such activities, and neither was he a victim of any putative violation thereof. Under the decisions of the Supreme Court of Virginia involving *Bowman* claims, and in perspective of the analytical guidance that the decision in *Anderson* provides, it is clear that Storey cannot fasten his wrongful discharge claim on either Va.Code § 18.2–178 or § 18.2–260.1.

The defendants persuasively have compared Storey's allegation of wrongful discharge to the *Bowman* claim that the Supreme Court of Virginia dismissed in *Dray v. New Market Poultry, Inc.*, 258 Va. 187, 190–91, 518 S.E.2d 312 (Va.1999). In *Dray*, the plaintiff was a former "quality control inspector" on the defendant-employer's poultry production lines. *Id.* at 189, 518 S.E.2d 312. The plaintiff alleged that her employer terminated her because she had informed a government inspector that the employer's product was adulterated, and she claimed that this termination violated the public policy expressed in the "Virginia Meat and Poultry Products Inspection Act." [33] *Id.* at 190, 518 S.E.2d 312. The Supreme Court of Virginia disagreed, however, and it explained that the plaintiff's claim was not cognizable because "a

---

**33.** *See* Va.Code §§ 3.1–884.17 through 884.36.

generalized, common-law 'whistleblower' retaliatory discharge claim ... has not been recognized as an exception to Virginia's employment-at-will doctrine[.]" *Id.* at 191, 518 S.E.2d 312 (refusing to expand *Bowman* doctrine to accommodate such a claim). The Supreme Court of Virginia reasoned as follows:

> The Act upon which this plaintiff relies does not confer any rights or duties upon her or any other similarly situated employee of the defendant. Instead, the Act's objective is "to provide for meat and poultry products inspection programs that will impose and enforce requirements with respect to intrastate operations and commerce." Code § 3.1–884.19. The plaintiff identifies two of the Act's provisions that she says articulate a public policy allowing her to evade the employment-at-will doctrine. She relies upon Code § 3.1–884.22, which forbids intrastate distribution of uninspected, adulterated, or misbranded meat and poultry products. She also relies upon Code § 3.1–884.25(2), which establishes criminal penalties for any person who "resists, ... impedes, ... or interferes" with state meat inspectors. These provisions do not secure any rights to this plaintiff, nor do any other provisions of the Act. Rather, the Act establishes a regulatory mechanism directed only to government inspectors and industry management.

*Id.* at 191–92, 518 S.E.2d 312. Affirming the trial court's decision sustaining the defendant's demurrer, the Supreme Court of Virginia observed that the statute upon which the plaintiff relied "affords [her] no express statutory right ... that is in specific furtherance of the state's public policy regarding inspections of meat and poultry products." *Id.* at 192, 518 S.E.2d 312.

The same is true with respect to the statutes that Storey proffers in support of his *Bowman* claim in this case. None of those statutes create a right with which Storey's termination interfered. Similarly, Storey was not terminated on account of his refusal to violate a duty that any of the three statutes imposes upon him.[34] Even if Storey was granted leave to amend Count IV, and even if the defendants effected his termination for the precise reasons that he alleges, Storey has failed to identify any Virginia statute that articulates a public policy that the defendants would have contravened by so doing. Accordingly, the motion to dismiss Count IV of the Complaint is granted and that count is dismissed with prejudice.

### 4. Count V—Breach of Fiduciary Duty

■ In Count V of the Complaint (in which only Sowers is implicated), Storey alleges that "Sowers owed a fiduciary duty to Storey as a stockholder of Patient First of fidelity, trust, and integrity in the exercise of his responsibilities as its [CEO][ ]" and that he "breached his fiduciary duties" through (1) "his scheme to cause the [Board] to terminate [Storey's] employment based on false information and in

---

**34.** Storey has not demonstrated how his acquiescence to Patient First's alleged fraudulent billing activity would have subjected him to criminal liability under any of the three statutes discussed above. Even if it were true that his silence (in the face of that illegal conduct) could have subjected him to criminal punishment, however, there is no factual basis stated in the Complaint upon which to infer that he was terminated because he "refused" to engage in criminal activity. Refusing to stand silent while others around you engage in criminal activity simply is not the same as refusing to engage in criminal activity, and, whereas a termination in the latter circumstance is actionable under *Bowman*, the Supreme Court of Virginia has not yet held that termination in the former circumstance is as well.

violation of the Contract"; (2) "false statements to Mays & Valentine [respecting allegations] that Storey usurped a corporate investment opportunity in Alfine"; (3) "causing the [Board] to terminate Storey's employment based upon [those] false charges[ ]"; and (4) "causing the [Board] to terminate Storey's employment [because Storey reported potential violations of law that Patient First and Sowers allegedly committed]." (Complaint, ¶ 82). Sowers has moved for dismissal of Count V on the ground that Virginia law requires that plaintiffs asserting claims for breach of fiduciary duty against corporate directors or officers must pursue such claims derivatively on behalf of the corporation, and not individually.[35]

In their respective briefs in support of, and in opposition to, the defendants' motion to dismiss, the parties discussed the somewhat conflicting decisional law that has emerged out of this district on the issue whether, in Virginia, an individual shareholder of a corporation may sue an officer or director of that corporation for breach of fiduciary duty. *Compare American General Ins. Co. v. Equitable General Corp.*, 493 F.Supp. 721 (E.D.Va.1980), *with Byelick v. Vivadelli*, 79 F.Supp.2d 610 (E.D.Va.1999). It is unnecessary to examine Storey's breach of fiduciary duties claim in perspective of the *American General Ins. Co.* and *Byelick* decisions, however, because, since they were decided, the

Supreme Court of Virginia authoritatively has decided the precise issue that the parties dispute. In *Simmons v. Miller*, 261 Va. 561, 576, 544 S.E.2d 666 (Va.2001), the Supreme Court of Virginia expressly "decline[d] to adopt a closely held corporation exception to the rule requiring that suits for breach of fiduciary duty against officers and directors must be brought derivatively on behalf of the corporation and not as individual shareholder claims." 79 F.Supp.2d at 625. The decision in *Simmons* clearly forecloses the type of claim that Storey alleges in Count V, therefore, the defendants' motion to dismiss that count is granted and Count V is dismissed with prejudice.

### 5. Count VIII—Statutory Conspiracy

In Count VIII of the Complaint (in which only Sowers and Morrison are implicated), Storey alleges that those defendants conspired in violation of Va.Code §§ 18.2–499 and 18.2–500 to "injure [him] in his reputation, trade business and profession and to hinder him from performing lawful acts."[36] (Complaint, ¶ 95). Sowers and Morrison have moved for dismissal of Count VIII on the ground that Storey's statutory business conspiracy claim is barred by the doctrine of *res judicata* because the court in the State Court action dismissed with prejudice an identical claim, a decision which this Court must afford full faith and credit.[37]

---

**35.** The defendants raised two additional arguments in support of their motion to dismiss Count V, however, because their first argument finds clear support in Virginia law, there is no need to consider those additional arguments.

**36.** Va.Code § 18.2–499, which is entitled "Combinations to injure others in their reputation, trade, business or profession; rights of employees[,]" creates criminal liability for persons who conspire willfully and maliciously to injure another in his reputation, trade,

business, or profession. Va.Code § 18.2–500 imposes civil liability for the same types of conspiratorial conduct.

**37.** Sowers and Morrison also argue that Storey's claim in Count VIII fails as a matter of law because Storey has claimed that he was injured by the alleged conspiracy in respect of his employment interests, and not in respect of any "business" interest that is cognizable under Va.Code §§ 18.2–499 and 18.2–500. They also contend that Storey's statutory conspiracy claim is barred by the doctrine of

Pursuant to 28 U.S.C. § 1738, state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." The Supreme Court of the United States expressly has held that, in determining the preclusive effect of a state court judgment, 28 U.S.C. § 1738 "directs a federal court to refer to the preclusion law of the State in which [that] judgment was rendered." *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985) (stating that 28 U.S.C. § 1738 "commands a federal court to accept the rules chosen by the State from which the judgment is taken.") (*citing Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982)); *see also In re Genesys Data Technologies, Inc.,* 204 F.3d 124, 127–28 (4th Cir.2000).

 Federal courts follow a two-step process in determining whether 28 U.S.C. § 1738 should apply in a particular situation. As the Fourth Circuit stated in *In re Genesys* :

> First, a federal court must look to state law to determine the preclusive effect of the state court judgment. (citation omitted). If state law would not bar relitigation of an issue or claim decided in the earlier proceeding, then the inquiry ends—a federal court will not give the state court judgment preclusive effect either. If state law would afford the judgment preclusive effect, however, then a federal court must engage in a second step—it must determine if Con-

gress created an exception to § 1738. (citation omitted). Only if "some exception to § 1738 applie[s]" can a federal court refuse to give a judgment the preclusive effect to which it is entitled under state law. (citation omitted). An exception "will not be recognized unless a later statute contains an express or implied partial repeal" of § 1738.

*Id.* at 128. Accordingly, it is first necessary to consider whether a court in Virginia would give preclusive effect to the relevant state court judgment.

Virginia recognizes the doctrine of *res judicata,* which "precludes relitigation of the same cause of action, or any part thereof, which could have been litigated between the same parties and their privies." *Smith v. Ware,* 244 Va. 374, 376, 421 S.E.2d 444 (Va.1992) (citations omitted). A judgment sought to be used as the basis for application of *res judicata* must be a final judgment. *See e.g., Faison v. Hudson,* 243 Va. 413, 419, 417 S.E.2d 302 (Va. 1992). In addition, in Virginia, the following four elements must exist before *res judicata* may operate to bar a subsequent proceeding: (1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made. *See e.g., Wright v. Castles,* 232 Va. 218, 222, 349 S.E.2d 125 (Va.1986) (*citing Mowry v. City of Virginia Beach,* 198 Va. 205, 211, 93 S.E.2d 323 (1956)).

 The state court judgment that is at issue is the November 20 Order. As noted above, and with respect to Storey's statutory business conspiracy claim in the

---

intracorporate immunity, which holds that, for purposes of evaluating conspiracy claims, corporations and the agents thereof should not be viewed as separate actors. *See generally Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974); *Bus-*

*chi v. Kirven,* 775 F.2d 1240, 1251–54 (4th Cir.1985). Because Storey's statutory business conspiracy claim is barred under principles of *res judicata,* however, it is not necessary to consider these additional arguments.

State Court action, that order sustained the state court defendants' demurrer as to that claim, dismissed the claim with prejudice, and denied Storey leave to amend it.

There can be little question that a Virginia court would afford preclusive effect to the resolution of Storey's statutory business conspiracy claim, as accomplished by the November 20 Order. As a general rule, a dismissal with prejudice is "as conclusive of the rights of the parties as if the suit had been prosecuted to a final disposition adverse to the plaintiff." *Dalloul v. Agbey,* 255 Va. 511, 514, 499 S.E.2d 279 (Va.1998) (*citing Gilbreath v. Brewster,* 250 Va. 436, 440, 463 S.E.2d 836 (Va.1995) and *Reed v. Liverman,* 250 Va. 97, 100, 458 S.E.2d 446 (Va.1995)). Such a dismissal ordinarily operates as *res judicata. See e.g., Reed,* 250 Va. at 100, 458 S.E.2d 446. Storey advances no ground upon which an exception to these general rules might apply.[38] Thus, it is clear that, if the aforementioned four elements exist in this case, the November 20 Order is a final judgment as to which the doctrine of *res judicata* properly applies.[39]

All four of the elements of *res judicata* are satisfied in this case. First, the remedies sought in Storey's Motion for Judgment in the State Court action, and in his Complaint in this case, are identical. In both cases, Storey sought compensatory, punitive, and treble damages in an amount exceeding one million dollars, together with interest, attorneys fees, and costs. He also sought, in both cases, a declaration as to certain contractual rights and such other relief as the respective courts might deem appropriate. Second, Storey asserted the identical cause of action in both claims. Count IX of the Motion for Judgment and Count VIII of the Complaint both assert a statutory business conspiracy claim pursuant to Va.Code §§ 18.2–499 and 18.2–500. Third, all of the parties to Storey's suit in this court (Storey, Patient First, Sowers, and Morrison) also were parties to his State Court action. Finally, in perspective of the foregoing, there can be no dispute that "the quality of the persons for or against whom the claim is made" is anything but identical. Accordingly, it appears that a court in Virginia would afford preclusive effect to that part of the November 20 Order in which the state court dismissed with prejudice Storey's statutory conspiracy claim.

Storey is thus barred from relitigating his statutory conspiracy claim unless some exception to 28 U.S.C. § 1738 applies in this case. Storey has not advanced any ground upon which to find that such an exception exists, and the Court has not found one either. Thus, by operation of the doctrine of *res judicata,* and pursuant to 28 U.S.C. § 1738, this Court must afford full faith and credit to the judgment of the Circuit Court of Henrico of County, as expressed in the November 20 Order. The defendants' motion to dismiss Count VIII of the Complaint is granted and that count is dismissed with prejudice.

**38.** The state court also denied Storey's motion for leave to amend Count IX of his Motion for Judgment, and overruled his objections to the November 20 Order itself, thereby emphasizing the finality of its judgment sustaining the defendants' demurrer.

**39.** It is worth noting that, after issuance of the November 20 Order, Storey timely filed a notice of appeal as to that order. At the May 10 hearing on this case, however, counsel for Storey represented that his client had failed to pursue that appeal. Therefore, because the November 20 Order is not, in fact, being appealed, the Virginia rule that "a judgment is not final for the purposes of *res judicata* ... when it is being appealed or when the time limits fixed for perfecting the appeal have not expired[ ]" does not impede application of *res judicata* in this case. *See e.g., Faison,* 243 Va. at 419, 417 S.E.2d 302.

## CONCLUSION

For the reasons set forth above, the defendants' March 8, 2002 Motion to Dismiss is granted as to Counts IV, V, and VIII of the Complaint. As to Counts I and III of the Complaint, that motion is denied, and, as to Count II of the Complaint, it is DENIED AS MOOT.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.